UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAUDI JUSTIN, and all others similarly situated; and THE COMMUNITY SERVICE SOCIETY OF NEW YORK;<br><br>          Plaintiffs,<br><br>    v.<br><br>MILTON ADAIR TINGLING, in his official capacity as County Clerk of New York County and Commissioner of Jurors,<br><br>          Defendant. | 22-cv-10370<br><br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

## INTRODUCTION

1.      This civil-rights action challenges the mass disenfranchisement of Black people—especially Black men—from the state court jury pool in Manhattan.  A New York statute—Section 510(3) of the Judiciary Law—disqualifies people convicted of felonies from serving on juries, no matter the offenses or how long ago the convictions occurred.  As a result of decades of racially-biased policing and prosecutorial practices determining which New Yorkers have felony convictions, the statute likely excludes from jury service more than one out of every of four otherwise jury-eligible Black residents of New York County.  For otherwise-eligible Black men, the exclusion is even more devastating, disqualifying likely *more than 40 percent* of them. This mass disenfranchisement dilutes the voting strength of Black citizens on grand juries and trial juries in both civil and criminal cases, which are bodies fundamental to democratic self-government and the administration of justice.  The reduction in jury diversity compromises the quality of deliberations, erodes public confidence in the fairness of the jury system, and hampers successful reintegration into society.

1

2.     Because the statutory exclusion is indefinite, the effects of racially biased policing and prosecution in Manhattan have accumulated over time.   Racist policies and practices throughout the past half-century, including disparate drug enforcement, broken-windows policing, and the New York City Police Department's unconstitutional stop-and-frisk program, shape the racial composition of the jury pool today.  Because of those policies (and countless others), Black people in Manhattan have been convicted of felonies at rates that vastly exceed any other racial group year in and year out.  Indeed, Manhattan consistently exhibits the greatest such disparities between Black and white people of any county in New York State.  Black people in Manhattan are grossly overrepresented among the population with felony convictions and underrepresented among prospective state court jurors.

3.     The statutory exclusion perpetuates a vicious cycle in Manhattan.   The underrepresentation of Black people in the jury pool contributes to disproportionately bad outcomes for Black people in the justice system, which in turn drives their underrepresentation in the jury pool, and so on.

4.     The only way for people with felony convictions to restore their jury eligibility is through a process that is intrusive, burdensome, and subject to the standardless discretion of sentencing judges or corrections officials.  Most people seeking relief have little, if any, access to counsel or other assistance with their applications.  Few New Yorkers with felony convictions ever see their jury service rights restored and therefore remain permanently excluded.  This exclusion contravenes the public interest in the successful reintegration of people with conviction histories.

5.     As applied in Manhattan with its history of racial bias in policing and prosecution, New York's statutory exclusion causes a persistent and substantial underrepresentation of Black people in the state court jury pool in violation of the Sixth and Fourteenth Amendments to the

United States Constitution.  The plaintiffs ask this Court to enjoin the Defendant Commissioner of Jurors of New York County from enforcing Section 510(3) of the Judiciary Law in New York County and halt the enormous damage it is inflicting on Black Manhattan residents, on the public at large, and on the jury system.

## NAMED PARTIES

6.     Plaintiff DAUDI JUSTIN is a 44-year-old Black man who is eligible to serve on a New York County jury but for the felony conviction he received in 2009.  He is a member of the bar of the State of New York and serves as a public defender.  The Exclusion disqualifies him from serving as a juror in the very courts in which he practices law.

7.     Plaintiff THE COMMUNITY SERVICE SOCIETY OF NEW YORK is a not-for-profit organization headquartered in Manhattan that supports individuals with conviction histories in New York City, including in New York County, to overcome barriers to civic participation, employment, and housing.

8.     Defendant the Honorable MILTON ADAIR TINGLING is the Commissioner of Jurors for the Supreme Court, New York County.  He is sued in his official capacity.

## FACTS

**Jury Service is a Form of Political Participation Fundamental to American Democracy.**

9.     Jury service is a cornerstone of our democratic system.  It is a constitutional means for citizens to participate in the administration of justice and, with voting, represents Americans' "most significant opportunity to participate in the democratic process."[1]  As the United States Supreme Court has recognized: "Just as suffrage ensures the people's ultimate control in the

---

[1] *Powers v. Ohio*, 499 U.S. 400, 407 (1991).

legislative and executive branches, jury trial is meant to ensure their control in the judiciary."[2]  For
the Framers, the jury was "fundamentally, a political institution embodying popular sovereignty
and republican self-government."[3]

10.     As with electoral suffrage, jury service for Black Americans was a topic of central
importance in the framing, enforcement, and resistance to the Civil War Amendments.  During
Reconstruction, "[i]ntegrating the jury box served several significant purposes—from affirming
the citizenship of those called to serve to countering impunity for white purveyors of racial
violence" to "fair treatment for black defendants."[4]  For many white people, the political equality
and efficacy of Black citizens serving and voting on juries "was even more objectionable than
black suffrage."[5]

11.     Black suffrage and jury service have long been conjoined targets of white
supremacy.[6]  Judge Tingling highlighted this important historical point in a recent article for the
Amsterdam News: "The imposition of poll taxes, literacy tests and grandfather clauses . . . not
only prevented persons of color from voting, but also from serving on juries."[7]  There were "Black

---

[2] *Blakely v. Washington*, 542 U.S. 296, 306 (2004) (collecting founding era sources).

[3] *Anderson v. Miller*, 346 F.3d 315, 325 (2d Cir. 2003) (quoting Akhil Reed Amar, *The Constitution and Criminal Procedure* 121-22 (1997)).

[4] Thomas Ward Frampton, *The Jim Crow Jury*, 71 Vanderbilt L. Rev. 1593, 1602 (2018).

[5] *Id.* (quoting Michael J. Klarman, *From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equality* 39 (2004)).

[6] *See, e.g.*, Frampton, *The Jim Crow Jury*, 71 Vanderbilt L. Rev. at 1614 (quoting *Jury Trials*, Daily Com. Herald., Apr. 3, 1887, at 4) ("The people of the Southern States were contending with difficulties such as no people on earth ever contended with before.  We have among us a race of people entire dissimilar in every respect from the race which furnished our juries before the war . . . . The jury system, with juries chosen from both races and unanimous verdicts required, is a failure . . . .").

[7] Judge Milton A. Tingling, *Jury Duty Is a Right and a Privilege*, N.Y. Amsterdam News (Oct. 1, 2020), https://amsterdamnews.com/news/2020/10/01/jury-duty-right-and-privilege/.

Codes which barred Blacks from serving on juries and Jim Crow laws that barred persons from serving on juries based on one's prior criminal conviction," Judge Tingling notes, which typically also denied Black individuals the right of electoral suffrage.

12.    Echoing the sacrifices of those who fought to secure equal rights to electoral suffrage, Judge Tingling explained: "People of all colors have petitioned, protested, marched, sat in, fought and died for the opportunity and right of people of color to serve on juries and make decisions as jurors who happen to be people of color."[8]

**Black People are Persistently and Significantly Underrepresented on Manhattan Juries.**

13.    New York court officials, including Judge Tingling, have long raised concerns about the underrepresentation of people of color on New York County juries.

14.    In 1988, the New York Unified Court System established the New York State Judicial Commission on Minorities (now, the Franklin H. Williams Judicial Commission).  The Commission undertook a comprehensive, three-and-a-half-year study of minority participation in New York's courts.  On the basis of its investigation, the Commission found that "[m]inorities are significantly underrepresented on many juries in the court system," and there "is reason to believe that minority underrepresentation affects jury outcomes in ways that disadvantage minority litigants."[9]

---

[8] Cyril Josh Barker, *Here Comes the Judge: Milton Tingling*, N.Y. Amsterdam News (June 11, 2015), https://amsterdamnews.com/news/2015/06/11/here-comes-judge-milton-tingling/ ("[Judge Tingling] notes that during the Jim Crow era, while Blacks struggled for the right to vote, they were also struggling for the right to serve on juries.").

[9] *Report of the New York State Judicial Commission on Minorities*, 19 Fordham Urb. L.J. 181, 242 (1991).

15.     The Commission also noted the challenge of quantifying the underrepresentation because "the Office of Court Administration (OCA) has not maintained comprehensive data on the number of minority jurors serving within the New York State court system."[10]

16.     Despite reforms intended to increase jury diversity implemented after the Commission Report (including expansion of potential juror source lists), the substantial underrepresentation of Black people in jury pools persists.

17.     In 2010, the Judiciary Law was amended to require the collection of juror data for the purpose of identifying and remedying racial and ethnic disparities in each county's jury pool. The law was amended in response to the publication of a 2007 survey report finding that people of color were grossly underrepresented among the prospective jurors in New York County's jury pool—a finding that one of the bill's sponsors characterized as "disturbing" but "not inconsistent . . . with the experience [of people] who practice [law] in Manhattan."

18.     In 2014, Judge Tingling, who served as a justice of the Supreme Court, New York County for over a decade prior to becoming jury commissioner, warned about the lack of diversity in Manhattan jury pools: "The juror pools in Manhattan, I don't believe in my experience as a trial judge, are representative enough to what the population of Manhattan is."[11]  Two years later, he observed, "In the many years I was a judge [and an attorney], I have never seen a majority-minority jury in the county of New York.  Most times it is completely to the contrary."[12]

---

[10] *Id.* at 237.

[11] Edgar Sandoval, *Exclusive: 'Soda Ban' Judge Milton Tingling Hopes to Diversify Manhattan Juror Pools as New County Clerk*, N.Y. Daily News (Dec. 3, 2014), https://www.nydailynews.com/news/politics/soda-judge-milton-tingling-diversify-juries-clerk-article-1.2031301.

[12] Michael Gareth Johnson, *New York County Clerk's Quest to Diversify the Jury Pool*, City & State New York (Apr. 13, 2016), https://www.cityandstateny.com/politics/2016/04/new-york-county-clerks-quest-to-diversify-the-jury-pool/180029/.

19.   Data on the racial composition of people who served as prospective jurors published by the Office of Court Administration ("OCA") confirm Judge Tingling and others' observations about the lack of diversity in the Manhattan jury pool.   Black people are underrepresented in the Manhattan jury pool.

20.   Over the last ten years, approximately 63,400 Black jurors served in the state courts of Manhattan.   This is significantly fewer Black jurors than a fairly representative system would generate.   If the County had a system that represented its citizen populace, approximately 17,100 more Black jurors would have served during this time.

21.   This substantial underrepresentation is statistically significant, indicating that the disparity in jury service is not the result of random chance.   Indeed, the likelihood that such a disparity could occur by random chance is less than 1 out of 1,000,000,000,000,000,000,000,000,000,000—less than the probability of buying one ticket each for the Mega Millions lottery, the Powerball lottery, and the New York Lotto, and winning all three.

22.   The underrepresentation of Black people in the state court jury pool in Manhattan is not attributable to a disproportionate failure of Black people to respond to jury summonses.   In fact, OCA data indicates that qualified Black residents of Manhattan are more likely to appear for jury service than the average qualified juror, regardless of race.   If qualified Black jurors had appeared for jury service only in proportion to their representation in the qualified populace, there would have been even fewer Black jurors in the last decade by thousands.

23.   The exclusion of people convicted of felonies from serving as jurors contained in New York's Judiciary Law Section 510(3)—referred to throughout this complaint as the "Exclusion"—ineluctably causes the underrepresentation of Black people in the Manhattan pool.

24.     Section 510 provides:

In order to qualify as a juror a person must:  1.  Be a citizen of the United States, and a resident of the county.  2.  Be not less than eighteen years of age.  3.  Not have been convicted of a felony.  4.  Be able to understand and communicate in the English language.

25.     These qualifications apply to serve as a juror on either a grand jury or a trial jury in civil or criminal cases.

26.     In Manhattan, approximately 152,000 Black residents are otherwise eligible to serve on a jury—i.e., they are resident citizens, over eighteen years of age, and can understand and communicate in English.  Nonetheless, of these otherwise eligible residents, approximately 38,000—25 percent—are disqualified from jury service due to a felony conviction.

27.     In contrast, of about 900,000 non-Black otherwise eligible Manhattan residents, approximately just 3 percent—28,000—are disqualified from jury service due to a felony conviction.

28.     The Exclusion generates a comparative disparity—which is a measurement of the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service—conservatively estimated at 20 percent and more likely to approximate 30 percent.

29.     The comparative disparity is more even egregious for Black men, reflecting the fact they receive the vast majority of felony convictions attributable to Black people in Manhattan. The Exclusion likely bars more than 40 percent of otherwise eligible Black male residents of Manhattan.  This grossly disproportionate rate is consistent with research on other large, diverse, metropolitan counties.[13]

_____

[13] For example, a peer-reviewed analysis of Georgia's practice of excluding individuals with felony convictions from juries found that several counties excluded in excess of 60 percent of all

30.     For the Black male population of Manhattan, the Exclusion generates a comparative disparity conservatively estimated at 35 percent but is likely higher.

31.     In Manhattan, the Exclusion is not racially neutral in its effect.

### Black Manhattanites Disproportionately Have Felony Convictions Due to a Long History of Racialized Policing and Prosecutorial Practices.

32.     The Exclusion disqualifies anyone with a felony conviction from jury service, regardless of the state or federal jurisdiction in which they were convicted; however, the Exclusion's racially biased effect in Manhattan is based in large part on the local history of racialized policing and prosecution.

33.     "[R]acialized policing in New York City has existed since [the NYPD's] inception and persists through contemporary police policies and practices," as then-Mayor Bill de Blasio acknowledged in March 2021.  Decades of targeted, racialized policies and practices have taken a disastrous toll on the Black community, with hundreds of thousands of Black people convicted of felonies and, consequently, excluded from serving on juries.

34.     Prosecutors have wide discretion over whether to pursue the cases that police bring them.  Manhattan prosecutors, however, have generally not exercised their discretion to alleviate the harm of racialized policing.  In a 2014 study of records from the Manhattan District Attorney, the Vera Institute of Justice found that the office "prosecutes nearly all cases brought by the police,

---

Black men, and that Fulton County—containing 112,799 Black male residents—excluded 46.2 percent of its Black male residents solely due to their prior felony convictions.  *See* Darren Wheelock, *A Jury of One's "Peers": Felon Jury Exclusion and Racial Inequality in Georgia Courts*, 32 Justice Sys. J., 335, 349 (2011).

including 94 percent of felonies, 96 percent of misdemeanors, and 89 percent of violations," with "no noticeable racial or ethnic differences at this discretionary point."[14]

35.     Understanding the full impact of the Exclusion requires examining decades of policing and prosecution practices because the Exclusion's indefinite ban means that a felony conviction that a Black Manhattanite received as an 18-year-old in 1986 continues to disqualify them from jury service as a 54-year-old today.

36.     Recent data reveal the depth at which racial bias has infected the criminal legal system in New York City, and Manhattan in particular.

37.     A 2021 analysis conducted by researchers at CUNY's John Jay College of Criminal Justice on case-level history records from between 1980 and 2019 maintained by the New York State Department of Criminal Justice Services ("DCJS") shows that approximately 417,212 living individuals have a felony conviction from a state court located in New York City.[15]  Federal, out-of-state, and out-of-city state court felony convictions will also disqualify New Yorkers from jury service; however, those convictions were not included in the CUNY analysis.

38.     Of the 417,212 unique individuals with felony convictions identified in the CUNY study, likely more than 196,600—or 47 percent—are Black.  For comparison, Black people account for about 22 percent of the City's total population.  In contrast, white people likely account for 11 percent of the individuals identified in the CUNY study, despite accounting for 32 percent of the City's total population.

---

[14] Besiki Kutateladze, Whitney Tymas, & Mary Crowley, *Race and Prosecution in Manhattan* 4 (Vera Institute of Justice, 2014), https://www.vera.org/downloads/publications/race-and-prosecution-manhattan-summary.pdf.

[15] Becca Cadoff et al., *Criminal Conviction Records in New York City (1980-2019)* 20, (The Data Collaborative for Justice at John Jay College of Criminal Justice, 2021), https://datacollaborativeforjustice.org/wp-content/uploads/2021/04/2021_04_07_Conviction_Record_Report.pdf.

39.     According to DCJS data, Manhattan has generated an outsized number of New York City's felony convictions.  Manhattan has consistently accounted for only about 20 percent of New York City's population, but approximately 40 percent of the City's felony convictions.

40.     Of the five boroughs, Manhattan has consistently exhibited by far the most severe racial imbalance in arrests and convictions.  According to DCJS data, from 2002 through 2019,[16] Black people in Manhattan were arrested for felonies at a rate 16.6 times greater than white people and convicted of felonies at a rate 21.3 times greater than white people—the largest such disparities of any county in the state.  This acute racial imbalance occurred every single year for which data exists and occurred during a period in which Black people were consistently and substantially underrepresented in the Manhattan jury pool.

41.     The disparity in conviction rates for felonies of any kind is far larger when Black men are compared to white people regardless of gender.  In Manhattan, Black men were convicted of felonies at a rate 18.8 times greater than white men; 32.7 times greater than white people, regardless of gender; and 103.8 times greater than white women.

42.     The significant racial disparities in the number of convictions of the County's resident Black citizens is the product of many years of aggressive policing and prosecution practices targeting Black residents.

43.     Some practices have directly contributed to the racial disparity in felony convictions.  For example, the enforcement of drug laws in Manhattan has targeted Black communities and directly yielded an enormous and grossly racially disparate number of felony convictions.  Some pervasive law enforcement practices overwhelmingly produce misdemeanor convictions or violations—or even stops and arrests that result in no conviction at all—but they

---

[16] DCJS does not publish data on convictions by racial group for the period prior to 2002.

have targeted Black people and elevated the risk that those targeted will be arrested, charged with, and convicted of felonies in the future.

44.     The following are illustrative practices over the past several decades that reveal a law-enforcement system administered in a manner that is not racially-neutral, is susceptible to the abusive exercise of discretion, and is infected with racial bias.  This system is responsible for branding people with felony convictions and disqualifying them from jury service.

*Drug-Law Enforcement Targeted Black Communities and Generated*
*the Largest Share of Felony Convictions in New York County.*

45.     Drug offenses make up the plurality of all felony convictions in New York City and in Manhattan.  According to researchers at CUNY, out of 778,527 felony convictions in New York City between 1980 and 2019, "drug charges (sale and possession)" were the most common category of offense and "made up 43.5% of all felony convictions."[17]

46.     Felony drug convictions have disproportionately come from Manhattan and against Black people.  Data from DCJS show that for the period beginning in 2002, over half of all felony drug convictions in the entirety of New York City occurred in Manhattan.  The same data also show that from 2002 through 2019, over half of all felony convictions of Black defendants in New York City occurred in Manhattan.

47.     Illegal drug usage rates do not substantially differ by race, ethnicity, or gender, regardless of whether they are measured on a monthly, yearly, or lifetime basis.  Indeed, the 2019 National Survey on Drug Use and Health shows that white people are more likely to have used illegal drugs in their lifetime than Black people.  For example, 55.6 percent of all surveyed white people reported using illegal drugs at some point in their lifetime, whereas 45.9 percent of surveyed

---

[17] Cadoff et al., *Criminal Conviction Records in New York City (1980-2019)* at 1.

Black people reported using illegal drugs at some point in their lifetime.  The survey also reports that 52.3 percent of men and 44.9 percent of women reported using illicit drugs at some point in their lifetime.

48.     Similarly, the rates at which people sell illegal drugs do not substantially differ by race or ethnicity—indeed, evidence suggests that white people are more likely to sell drugs than Black people.[18]

49.     At bottom, any difference in drug usage or sales rates for a specific racial or gender demographic is vastly exceeded by the rate at which Black men have been convicted of drug felonies—e.g., between 2013 and 2019, New York County convicted Black men of felony drug offenses at a rate 130.1 times greater than white women; 40.8 times greater than white people, regardless of gender; and 23.5 times greater than white men.

50.     The stark racial imbalance in Manhattan's conviction rates is rooted in New York's racialized "War on Drugs."

51.     In 1973, New York enacted the "Rockefeller Drug Laws" (named after then-Governor Nelson Rockefeller), which punitively reclassified many drug offenses as felonies, including all drug sale offenses and some common minor possession offenses.  The Rockefeller Drug Laws signaled a shift from a "policy rhetorically committed to reintegrating drug addicts to a policy of social expulsion" and sought to "protect 'the public' from the 'addict' and the drug dealer or 'pusher,'" who was "almost universally understood to be a Black or Puerto Rican man.'"[19]

---

[18] *See*, *e.g.*, U.S. Dep't of Health & Human Servs., *Results from the 2019 National Survey on Drug Use and Health*, Table 3.12B (2019) (reporting that white respondents were more likely to have sold drugs in the last year than Black respondents).

[19] Julilly Kohler-Hausmann, *"The Attila the Hun Law": New York's Rockefeller Drug Laws and the Making of a Punitive State*, 44 J. Soc. Hist. 71, 73-74 (2010).

52.     Punitive drug legislation aimed at the Black community continued in the 1980s with New York's promulgation of "a strict anti-crack law, intended specifically to subject more smalltime sellers (many of whom were being arrested for misdemeanor possession) to Class D felony charges."[20]

53.     Beginning in the 1980s, law-enforcement authorities in New York aggressively enforced New York's punitive and racialized drug laws.[21]   City Hall and the NYPD deployed expansive street-level drug-enforcement schemes that flooded police officers into neighborhoods with high concentrations of Black residents.  In these neighborhoods, officers used intensive "buy-and-bust" operations and racked up tens of thousands of drug arrests each year.  Black community leaders "found that officers '[couldn't] tell the good guys from the bad guys' and were 'grabbing our children . . . because they think everyone Black and Hispanic is a drug dealer.'"[22]  A significant part of the drug enforcement scheme was the emphasis on crack cocaine, which was closely associated with Black communities; notwithstanding that powder cocaine was also widely used by non-Black communities in the city at the time.  During this time, city officials also launched "a campaign to make more [drug] arrests that would hold up in court as serious felonies."[23]

54.     As a result of decades of these practices, New York State's prison population exploded.  In 1973 there were 1,488 people incarcerated in state prison for drug offenses; in 1983 that number doubled to 3,187, and by 1994 it had skyrocketed to 23,082.[24]   Black men were

---

[20] Mason B. Williams, *How the Rockefeller Laws Hit the Streets: Drug Policing and the Politics of State Competence in New York City, 1973-1989*, 4 Modern Am. Hist. 67, 87 (2021).

[21] *Id.* at 68.

[22] *Id.* at 81.

[23] *Id.* at 86.

[24] N.Y. State Div. of Crim. Justice Servs., *Felony Drug Arrest, Indictment and Commitment Trends 1973-2008* 6 (2010), https://perma.cc/33S2-JEXM.

overwhelming targets of enforcement: "In 2001, for every one white male aged 21 to 44 incarcerated under the Rockefeller Laws, 40 black males of similar age were incarcerated for the same offense."[25]

55.     After decades of pressure from advocates, New York enacted reforms to the Rockefeller Drug Laws in 2009; however, racially disparate drug-law enforcement in Manhattan persisted.  From 2002 through 2009, before the drug-law reforms, Black people were convicted of drug felonies at a rate 41.6 times greater than white people in Manhattan.  From 2010 through 2019 in Manhattan, after the reforms took effect, Black people were still convicted of felony drug offenses at a rate 25.2 times greater than white people.

*Dragnet Policing Programs—Such as Broken Windows and Stop & Frisk—Target Black People, Mark Them for More Punitive Treatment, and Increase Their Risk of Felony Convictions.*

56.     The history of New York City's long-term deployment of large-scale enforcement practices not resulting in many felony arrests also illustrates how policing in Manhattan has acted as a racial dragnet that makes Black people, and Black men in particular, disproportionately vulnerable to felony convictions.

57.     Since the mid-1990s, the NYPD has used programs and practices like stop-and-frisk and broken windows enforcement of 'quality-of-life' offenses to conduct millions of stops, summonses, and arrests of poor people and people of color—many of which were unrelated to any wrongdoing and resulted in no conviction, others of which resulted in only violations or misdemeanors.  These law-enforcement contacts marked disproportionately Black—and mostly innocent—subjects for further law-enforcement contacts, leaving them more vulnerable to future

---

[25] Elizabeth Hinton, *An Unjust Burden: The Disparate Treatment of Black Americans in the Criminal Justice System* 5 (Vera Institute of Justice, 2018), https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf.

felony convictions and contributing to the systemic exclusion of Black people from the jury-eligible population.[26]

58.     One prominent example of how these sub-felony contacts increase an individual's risks of future felony convictions is law-enforcement's practice of using individuals' records of arrest and prosecution ("rap sheet") to influence future policing and prosecutorial decisions.  A rap sheet is a form of "marking" that is "an official state stamp on the [individual] that designates something about his participation in the criminal justice system."[27]  An individual with a rap sheet or one marked with a number of sub-felony entries is more likely to be targeted by law enforcement in the future, even if the number of those entries is inflated with misdemeanors and violations caused by order-maintenance policing programs like broken windows policing.  Although rap sheets are the most prominent form of marking, stops and arrests can mark people for additional law enforcement scrutiny, even when not included on a rap sheet.  For example, even though the law prohibits those sealed records from being used for criminal investigatory purposes, the NYPD has, at various times, used stop records, sealed arrests and convictions records, and juvenile arrests and convictions records for criminal investigatory purposes in violation of state law.

59.     Rap sheets affect prosecutors' charging and plea offer decisions.  Individuals whose rap sheets are marked with prior arrests, violations, or misdemeanors are less likely to receive lenient plea offers, including reducing a felony charge to a misdemeanor.  In contrast, groups that

---

[26] Joe Soss & Vesla Weaver, *Police Are Our Government: Politics, Political Science, and the Policing of Race-Class Subjugated Communities*, 20 Ann. Rev. Poli. Sci. 565, 580 (2017), https://www.annualreviews.org/doi/pdf/10.1146/annurev-polisci-060415-093825 ("Arrests and criminal records confer inferior civic status and impose social stigma, which work together to legitimate institutional exclusions, focus suspicion and surveillance, and authorize private practices of discrimination.").

[27] *See* Issa Kohler-Haussman, *Misdemeanor Justice: Control Without Conviction*, 119 Am. J. Soc. 351, 366-67 (Sept. 2013), http://users.soc.umn.edu/~uggen/Kohler_Hausmann_.pdf.

receive greater prosecutorial leniency in sub-felony enforcement are significantly less likely to have a subsequent misdemeanor or felony offense.[28]

60.     One of the largest drivers of these inflated rap sheets was the NYPD's use of broken windows policing.  In 1994, during the Giuliani Administration, the NYPD first articulated that "broken windows" policing would be the driving force in the development of policing policy— that is, the NYPD would apply its enforcement efforts to "reclaim the streets" by aggressively enforcing laws against open alcoholic beverage containers, disorderly conduct, graffiti, panhandling, bicycling on the sidewalk, fare beating, public intoxication, public urination, and other low-level offenses.

61.     These low-level offenses can nonetheless carry serious consequences that will increase the risk of future felony convictions, including jail time, fines, fees, and civil consequences that can affect employment, housing, and other important opportunities.  For example, as the New York State court system web site notes: "A Class B Misdemeanor conviction, like possession of graffiti instruments, means you cannot live in a New York City Housing Authority apartment for at least 3 years after you finish your sentence."[29]

62.     Broken windows policing has persisted through each subsequent mayoral administration, and the consistent result of this aggressive enforcement has been the grossly disparate rate at which Black people have been stopped, ticketed, arrested, and prosecuted.  The

---

[28] Amanda Agan et al., *Misdemeanor Prosecution*, Quarterly Journal of Economics (forthcoming) (NBER Working Paper No. 28600 at 3-5), http://www.nber.org/papers/w28600.

[29] New York State Unified Court System, *Collateral Consequences Basics*, https://nycourts.gov/courthelp/criminal/collateralConsequencesBasics.shtml (last visited Dec. 5, 2022).

total volume of misdemeanor arrests increased dramatically and Black New Yorkers—and particularly, young Black men—experienced the greatest increases of any group.[30]

63.     Manhattan has had an outsized share of New York City's misdemeanor arrests and convictions, and the data reveals vast racial inequities in every single year.  From 2002 through 2019, there were over 936,000 misdemeanor arrests and nearly 393,000 misdemeanor convictions in Manhattan—more than any other borough.  Though consistently comprising about 20 percent of New York City's population, Manhattan accounted for nearly 28 percent of all misdemeanor arrests and nearly 36 percent of all misdemeanor convictions in New York City during that time. For every major category of offense tracked by DCJS except Driving While Intoxicated ("DWI"), Black people accounted for a majority of misdemeanor convictions in Manhattan from 2002 through 2019, even though they accounted for approximately one-eighth of the borough's population.

64.     Misdemeanor drug enforcement exhibits a strong law enforcement focus on Black people, and Black men in particular.  From 2002 through 2019, Black people accounted for 70,131 or 61.0 percent of Manhattan's total of 114,962 misdemeanor drug convictions during that time. Black people were convicted of misdemeanor drug offenses at a rate 28.8 times greater than white people.  From 2013 through 2019, DCJS data show that Black men were convicted of misdemeanor drug offenses at a rate 129.0 times greater than white women; 43.1 times greater than white people, regardless of gender; and 25.0 times greater than white men.

---

[30] Meredith Patten et al., *Trends in Misdemeanor Arrests in New York, 1980 to 2017: A Report of the Misdemeanor Justice Project John Jay College of Criminal Justice* 39, 66 (Dec. 26, 2018), https://datacollaborativeforjustice.org/wp-content/uploads/2018/12/FINAL.pdf.

65.     For other categories of offenses besides drug and DWI offenses,[31] Black people accounted for 58.0 percent of the total 182,310 property misdemeanor convictions and 56.8 percent of 86,272 "Other" misdemeanor convictions in Manhattan from 2002 through 2019.  During that time period in Manhattan, Black people were arrested at a rate 12.1 times greater than white people and convicted at a rate 20.8 times greater than white people for misdemeanors in the "Property" or "Other" categories.

66.     Broken windows policing has also generated millions of summonses that have disproportionately saddled Black people with fines, fees, court appearances, and warrants, all of which jeopardize Black people's social and economic stability and raise their risk of felony convictions.  According to OCA, of over 7 million summonses issued in New York City between 2001 and 2014, approximately 1.87 million summonses were issued in Manhattan.  The available data on race indicate that the plurality of summonses—approximately 46 percent—went to Black people while only 14 percent went to white people.

67.     Another example of a prominent, and unconstitutional, program the NYPD engaged in that led to significant contacts between Black people and the police is stop-and-frisk. Courts and civil rights enforcement authorities have repeatedly recognized that the NYPD has engaged in systemic racial profiling.

68.     In the aftermath of the murder of Amadou Diallo in February 1999 by members of the NYPD Street Crimes Unit, the New York State Attorney General ("OAG") investigated the

---

[31] Black people still accounted for an outsized share of misdemeanor DWI convictions (25.0 percent) during that time period compared to their share of the adult population in Manhattan (12.4 percent); however, there were only 9,269 total misdemeanor DWI convictions during between 2002 and 2019.

NYPD's stop-and-frisk practices (particularly those of the Street Crimes Unit).[32]  The OAG report showed that Black and Latinx people were much more likely to be stopped and searched, even when the statistics were adjusted to reflect differing criminal participation rates in some neighborhoods.[33]  The NYPD's 1990s era stop-and-frisk practices generated a class action, *Daniels v. City of New York*, challenging the Department's racial profiling tactics that resulted in a consent decree that required the NYPD to establish a written policy that complies with the United States and New York State Constitutions.  Unfortunately, however, the *Daniels* consent decree did not put an end to NYPD's discriminatory stop-and-frisk practices, as the 2013 federal stop-and-frisk case *Floyd v. City of New York* case revealed over a decade later.[34]

69.     In 2008, leaked recordings from an NYPD officer confirmed what many Black New Yorkers already knew: even post-*Daniels*, the NYPD continued to maintain an aggressive policy to stop, question, and frisk Black men.[35]

70.     Then, in *Floyd*, former NYPD captain and current New York City mayor Eric Adams testified that the former NYPD Commissioner Raymond Kelly informed him that the NYPD's stop-and-frisk program targeted and "focused on [Black and Latinx men] 'because he

---

[32] Civil Rights Bureau, Office of the Attorney Gen. of the State of N.Y., *The New York City Police Department's "Stop & Frisk" Practices* 4-5 (1999), available at https://www.google.com/books/edition/The_New_York_City_Police_Department_s_St/fGJTRZ gvUBoC?hl=en&gbpv=1As.

[33] *Id.* at 89-96.

[34] *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).

[35] Cyril Josh Barker, *NYPD Recordings Confirm Longstanding Speculation Over Targeted Stop and Frisk*, N.Y. Amsterdam News (Apr. 12, 2011), https://amsterdamnews.com/news/2011/04/12/nypd-recordings-confirm-long-standing-speculation/.

wanted to instill fear in them, every time they leave their home, they could be stopped by the police.'"[36]

71.     Mayor Michael Bloomberg stated that he thought the NYPD "disproportionately stop[s] whites too much and minorities too little."[37]  He would later state that in New York

> 95 percent of murders and murderers and murder victims fit one M.O.  You can just take the description, Xerox it, and pass it out to all the cops.  They are male, minorities, 16-25.  That's true in New York, that's true in virtually every city . . . that's where the real crime is. . . .  So you want to spend the money on a lot of cops in the streets.  Put those cops where the crime is, which means in minority neighborhoods.  So one of the unintended consequences is people say, 'Oh my God, you are arresting kids for marijuana that are all minorities.'  Yes, that's true.  Why?  Because we put all the cops in minority neighborhoods.  Yes, that's true.  Why do we do it?  Because that's where all the crime is.  And the way you get the guns out of the kids' hands is to throw them up against the wall and frisk them . . . .[38]

72.     As one young Black Harlem resident who was repeatedly stopped and frisked explained, "'Essentially, I incorporated into my daily life the sense that I might find myself up against a wall or on the ground with an officer's gun at my head . . . [f]or a black man in his 20s like me, it's just a fact of life in New York.'"[39]

73.     While the NYPD's stop-and-frisk program was implemented throughout the City, the NYPD's unconstitutional practices reached their apex in Black neighborhoods.  In 2013, in *Floyd v. City of New York*, a court in this district found that "the NYPD carrie[d] out more stops in areas with more black and Hispanic residents . . . [and] the best predictor for the rate of stops in

---

[36] *Floyd*, 959 F. Supp. 2d at 606.

[37] Associated Press, *Bloomberg: Police Stop Minorities "Too Little"*, June 28, 2013 (cited in *Floyd*, 959 F. Supp.2d at 666 n.776)*.*; *see also Floyd*, 959 F. Supp. 2d at 666 n.776 (noting that former NYPD Commissioner Raymond Kelly "has argued that 'really, African-Americans are being under-stopped'") (citations omitted).

[38] Shane Croucher, *Bloomberg Stop and Frisk Comments Resurface, Said He Put 'All the Cops' in Minority Neighborhoods 'Where All the Crime Is'*, Newsweek (Feb. 11, 2020), https://www.newsweek.com/bloomberg-2020-stop-frisk-comments-new-york-aspen-1486674.

[39] Nicholas K. Peart, *Why Is the N.Y.P.D. After Me?*, N.Y. Times (Dec. 17, 2011).

a geographic unit . . . [was] the racial composition of that unit rather than the known crime rate."[40]

Further, "regardless of [a geographical unit's] racial composition, blacks and Hispanics [were]

more likely to be stopped than whites."[41]   These disparities were the result of the NYPD's

"unwritten policy of targeting 'the right people' for stops [which] [i]n practice . . . encourage[d]

the targeting of young black and Hispanic men based on their prevalence in local crime

complaints."[42]   The court held that the NYPD's stop-and-frisk program violated the Fourth and

Fourteenth Amendments to the United States Constitution.[43]

74.     Pervasive, racially targeted order-maintenance policing in Manhattan has left Black

communities disproportionately vulnerable to future felony convictions.

*Law Enforcement Has Dehumanized Black Youth and Subjected Them to Intense Surveillance,*
*Substantially Increasing Their Risk of Misdemeanors and Disqualifying Felony Convictions.*

75.     For decades, law enforcement in Manhattan has negatively stereotyped Black youth

and subjected them to more intense monitoring than members of other racial groups.  This grossly

disparate monitoring has subjected Black youth in Manhattan to grossly disparate rates of arrests

and convictions for misdemeanors, undermined their socioeconomic stability, and increased their

vulnerability to receiving felony convictions that will disqualify them from jury service.

76.     The widely-known example of four Black teenagers and one Latinx teenager who

were arrested, tried, and convicted, for the 1989 rape of a white woman in Central Park—though

---

[40] *Floyd*, 959 F. Supp. 2d at 589.

[41] *Id.*

[42] *Id.* at 561.

[43] *Id.* at 562 ("In conclusion, I find that the City is liable for violating plaintiffs' Fourth and
Fourteenth Amendment rights. The City acted with deliberate indifference toward the NYPD's
practice of making unconstitutional stops and conducting unconstitutional frisks. Even if the City
had not been deliberately indifferent, the NYPD's unconstitutional practices were sufficiently
widespread as to have the force of law.").

later exonerated—is illustrative.  The reaction of New York City officials to the initial arrest and conviction was a harbinger of political scientist John DiIulio's now-discredited and disavowed "superpredator" theory.  This theory, which widely informed policing policy in the 1990s, portrayed inner-city Black children as a coming "army of young male predatory street criminals who make even the leaders of the Bloods and Crips . . . look tame by comparison."[44]

77.     As historian Elizabeth Hinton explained:

The police, investigators, and the press dubbed the boys' actions in the park that night "wilding."  Two days after the remaining three suspects had been arrested, the New York Post portrayed "wilding" as "packs of bloodthirsty teens from the tenements, bursting with boredom and rage, roam[ing] the streets getting kicks from an evening of ultra-violence." . . . The concept of "wilding" and the racist assumptions behind it made it seem plausible to law-enforcement authorities and the public that black and brown boys' mischief could easily turn into violent rape.[45]

78.     New York City's then-mayor and future mayors also contributed to the racist frenzy:

Manhattan Borough President and mayoral candidate David Dinkins proposed an "antiwilding law" with increased penalties for anyone who committed a crime as part of a group.  Mayoral candidate Rudolph Giuliani argued for severe measures to "combat 'mindless violence' perpetrated by marauding gangs on 'wilding' sprees," and Mayor Ed Koch advocated for expanding the "death penalty" to "incidents of wilding."[46]

79.     The treatment of the Central Park Five is part of a long history of New York criminalizing Black minors.

---

[44] Robin Walker Sterling, *"Children are Different": Implicit Bias, Rehabilitation, and the "New" Juvenile Jurisprudence*, 46 Loy. L.A. L. Rev. 1019, 1057-58 & 1058 n.310 (2013).

[45] Elizabeth Hinton, *How the 'Central Park Five' Changed the History of American Law*, The Atlantic (June 2, 2019), https://www.theatlantic.com/entertainment/archive/2019/06/when-they-see-us-shows-cases-impact-us-policy/590779/.

[46] Sterling, *"Children are Different"*, 46 Loy. L.A. L. Rev. at 1058 n.310 (citing Michael Welch et al., *Moral Panic Over Youth Violence: Wilding and the Manufacture of Menace in the Media*, 34 Youth & Soc'y 3, 9-10, 21 (2002)).

80.    For decades, until legal reforms that raised the age of criminal responsibility took effect in 2018 and 2019, tens of thousands of 16- and 17-year-olds were arrested for adult criminal offenses each year.  These youths were disproportionately Black and male.

81.    From 1990 to 2017, the average annual misdemeanor arrest rate of 16- and 17-year-old Black boys in New York City was 18,324 per 100,000 people—4.6 times the average misdemeanor arrest rate of 16- and 17-year-old white boys during the same period.  In fact, in 2010, approximately one in four 16- and 17-year-old Black boys in New York City was arrested for a misdemeanor *that year*.[47]

82.    In 2017, New York enacted legislation known as "Raise the Age," which was intended to end the state's practice of automatically charging 16- and 17-year-olds as adults.

83.    However, despite the Raise the Age reforms, significant racial disparities in policing children of color persist.  In the first year following the reforms, "there were still 2,522 arrests of 16-year-olds . . . [a]nd while the number of arrests declined, racial disparity did not."[48]  During that time, a large majority of "all youth arrested in New York City were Black (61%)" and "the vast majority were male (85%)."[49]

84.    The racialized policing of Black youth extends beyond arrests to include increased surveillance, which itself carries enormous consequences.  Most notably, the NYPD maintains a vast database of people whom the police claim are connected to gangs, known colloquially as the "Gang Database."  The people included in the database are

---

[47] Patten et al., *Trends in Misdemeanor Arrests in New York, 1980 to 2017* at 78.

[48] Youth Justice Research Collaborative, *Evaluating the Implementation of Raise the Age in New York City* 1 (August 2020), https://www.cdfny.org/wp-content/uploads/sites/3/2020/09/Raise-the-Age-Evaluation-Policy-Brief.pdf.

[49] *Id*. at 3.

disproportionately young and Black.  Between 2003 and 2013, approximately 30 percent of the 21,357 people added to the Gang Database were under 18 at the time they were first included.[50] Children as young as 13 have been included in the Gang Database.[51]  A majority of individuals included in the database are Black, even though Black people make up less than one-quarter of the city's total population.[52]

85.    In June 2018, then-NYPD Commissioner Dermot Shea testified before the City Council Committee on Public Safety that 99 percent of the approximately more than 17,000 people listed in the Gang Database were Black and Latinx.  According to the NYPD, in the mid-2010s, the Gang Database included more than 34,000 people who were subject to intense police monitoring and placed at greater risk of misdemeanor and/or disqualifying felony convictions.

86.    The NYPD has also included individuals in the database based on the dragnet surveillance of public-housing developments, which have a high concentration of Black residents, on the grounds that these individuals have "frequent presence at a known gang location" or "associat[e] with known gang members"—an assumption that ignores that gang

---

[50] K. Babe Howell, *Gang Policing: The Post Stop-and-Frisk Justification for Profile-Based Policing*, 5 U. Denv. Crim. L. Rev. 1, 16 (2015).

[51] Daryl Khan, *New York City's Gang Database Is 99% People of Color, Chief of Detectives Testifies*, Juvenile Justice Information Exchange (June 14, 2018), https://jjie.org/2018/06/14/new-york-citys-gang-database-is-99-people-of-color-chief-of-detectives-testifies/.

[52] Letter from Civil Rights Groups to Philip Eure, Office of the Inspector General for the New York City Police Department, New York City Department of Investigation (Sept. 22, 2020), https://www.hrw.org/news/2020/09/22/groups-urge-nypd-inspector-general-audit-nypd-gang-database#_ftnref12 ("According to the NYPD's categories, nearly 66 percent of those added to the database between December 2013 and February 2018 were black and 33 percent were Hispanic."); *see also* Howell, *Gang Policing*, 5 U. Denv. Crim. L. Rev. at 16 ("Of the 21,537 who were added between January 2001 and August 30, 2013, just one percent (212 individuals) of those entered into the gang database were categorized as Caucasian or white. Approximately 48% of the individuals added to the database between 2003 and 2013 were identified by the NYPD as black, another 42% Hispanic, nearly 8% 'unidentified' and less than 4% were female.").

members have "friends, family, neighbors, classmates, and coworkers," who may not be involved in any criminal enterprise.[53] "We are coming to find you and monitor every step you take," said the NYPD Housing Bureau chief, "[a]nd we are going to learn about every bad friend you have."[54]

87.    Inclusion in the database has resulted in severe consequences for the Black people who disproportionately populate it.  Among other consequences "[i]nclusion in the database can mean intensive surveillance, police harassment, overcharging, increased bail . . . and prejudicial treatment in court: a separate track of justice based on an allegation that doesn't even have to be proven."[55]

*Policymakers—Including the Police Commissioner, Mayors, and District Attorney—Repeatedly Acknowledge Systemic Racism in Policing and Prosecution.*

88.    Policymakers have repeatedly acknowledged that policing and prosecution in New York City have been infected with racial bias.

89.    In February 2021, then NYPD Commissioner Dermot Shea said: "These many years of racist policies and practices have caused—and, more importantly, continue to cause—immeasurable harm."[56]

---

[53] Ltr. from Civil Rights Groups to Eure, , *supra* note 55.

[54] Ben Popper, *How the NYPD Is Using Social Media to Put Harlem Teens Behind Bars*, The Verge (Dec. 10, 2014), https://www.theverge.com/2014/12/10/7341077/nypd-harlem-crews-social-media-rikers-prison.

[55] Lucy Litt, *RICO: Rethinking Interpretations of Criminal Organizations*, 26 Berkeley J. Crim. L.J. 71, 91 (2021).

[56] Dean Meminger, *Commissioner Dermot Shea Apologizes for Systemic Racism in the NYPD*, Spectrum News NY1 (Feb. 24, 2021), https://www.ny1.com/nyc/manhattan/public-safety/2021/02/24/commissioner-shea-apologizes-for-systemic-racism-in-the-nypd.

90.    In March 2021, then-Mayor Bill de Blasio recognized "the harmful legacy of racialized policing" in New York City.[57]

91.    In June 2021, now-Mayor Adams said, "We have to change the racist DNA of the [NYPD]."[58]

92.    Alvin Bragg, now-Manhattan District Attorney, wrote in October 2021, "One criminal justice system is for the wealthy and well-connected, where prosecutors and judges hesitate, negotiate, and, if they even think about bringing criminal charges, are tempted to settle. The other is for poor Black, brown, and vulnerable communities where even before a trial, you can be sent to a death trap like Rikers."[59] District Attorney Bragg further wrote: "Over-incarceration of poor communities and communities of color is fundamentally connected to underenforcement of elite economic crimes."[60]

93.    District Attorney Bragg's observations are consistent with an analysis by the Vera Institute of Justice, which found that race was a factor in the Manhattan DA's office's pre-trial detention decisions and that Black defendants were more likely to be detained than any other group.[61] Vera noted: "The decision to set bail, and, if so, in what amount, is significant not only because pretrial detention is itself a form of punishment to those who cannot make or are denied bail, but also because research shows it affects the likelihood of pleading guilty and the final

[57] City of New York, *A Recovery for All of Us: Mayor de Blasio Announces Next Phase of Police Reform Effort* (Mar. 12, 2021), https://www1.nyc.gov/office-of-the-mayor/news/181-21/recovery-all-us-mayor-de-blasio-next-phase-police-reform-effort.

[58] Nicole Johnson, *Eric Adams, Others Call for End to Racism Inside NYPD*, WPIX11 (June 19, 2020), https://pix11.com/news/local-news/eric-adams-others-call-for-end-to-racism-inside-nypd/.

[59] Alvin Bragg & Zephyr Teachout, *It's Time to End Murder by Spreadsheet*, The Nation (Oct. 29, 2021), https://www.thenation.com/article/politics/white-collar-prosecutions/.

[60] *Id.*

[61] Kutateladze et al., *Race and Prosecution in Manhattan* at 5.

sentences that are imposed."[62]  Pre-trial detention on Rikers Island is a brutal experience that has induced people without prior felony convictions to plead guilty to felonies.[63]

94.    In sum, decades of law-enforcement policies and practices have targeted Black people and particularly Black men.  From broken windows policing to disparate drug enforcement and unconstitutional stop-and-frisk practices, Black people have been marked as criminals in the eyes of law enforcement and put at substantially greater risk of felony convictions that disqualify them from jury service.

### New York's Process for Restoring Jury Service Eligibility to People with Felony Convictions Is Burdensome, Intrusive, and Subject to Standardless Discretion.

95.    New York's onerous, invasive, and arbitrary process by which those convicted of felonies can have their right to serve on juries restored stands in stark contrast to the process for restoration of its companion in democracy: electoral suffrage.  While a New Yorker with a felony conviction who loses their voting eligibility during their term of incarceration will automatically regain the right to vote again immediately upon release (even if on parole), that same New Yorker will never have their jury eligibility restored automatically, even after they successfully complete any probation or parole.

96.    Felony convictions impose barriers to a wide range of rights and benefits, including holding public office, owning a firearm, living in public housing, and receiving a variety of employment licenses, as well as eligibility to serve on a jury.  However, the process for removing those barriers is "one size fits all."  An applicant seeking restoration of jury service eligibility must

---

[62] *Id.* at 5 & 9 n.5 (collecting sources).

[63] *See*, *e.g.*, Mary E. Buser, *How Rikers Drove My Innocent Patient to Plead Guilty*, Politico Magazine (Oct. 6, 2015), https://www.politico.com/magazine/story/2015/10/rikers-island-plea-bargains-213223/.

endure the same process as one seeking to remove a barrier to license a firearm, among a panoply of other civil consequences of criminal convictions.

97.     To have their jury eligibility restored, a New Yorker with a felony conviction must apply for and be granted a Certificate of Relief from Disabilities or Certificate of Good Conduct. The applicable authority—either the sentencing court or the Department of Corrections and Community Supervision ("DOCCS")—effectively has standardless discretion over the decision to grant a certificate.  But even these forms of relief do not automatically return a citizen to the jury pool.  New York law gives jury commissioners discretion to decide whether a person with a felony conviction should be returned to the jury pool, even if they have received a certificate.

98.     Neither the courts' nor DOCCS' public materials concerning the certificate application process mention that a certificate will remove a barrier to jury eligibility.  Both the FAQ page and the "Qualifications for Jury Service" page on NYJUROR.GOV state that jurors "must not have been convicted of a felony," but neither page mentions that jury service eligibility can be restored at all, let alone that certificates are the means to do so.[64]

99.     For those few New Yorkers aware of the availability of certificates, the process of applying for one is burdensome, intrusive, and lengthy.  In practice, it is available to only a small percentage of people with felony convictions.

100.    Determining whether an individual applies for a certificate from the sentencing court or DOCCS is often confusing and depends on an individual's level of offense, previous conviction history, and whether an individual is sentenced to state prison.

---

[64] *See* N.Y. State Unified Court System, *General Information*,  https://www.nyjuror.gov/GI.shtml (last visited Dec. 5, 2022) (providing links to pages for "Questions and Answers (FAQ)" and "Qualifications for Jury Service").

101.    An individual may apply to their sentencing court for a certificate only if they have

no prior felony convictions and are not sentenced to state prison time.  New York state courts'

website on "Applying to Court for a Certificate of Relief from Civil Disabilities" expressly reflects

a judicial norm of requiring far more information than the application requests:

> *Important!* Even though the application form does not ask for proof of
> rehabilitation, you should attach any evidence you have, like a personal letter that
> explains what happened and how you are sorry; letters of recommendation from
> jobs or clergy; or certificates of completion of drug treatment, job training or
> volunteer work. . . . Submitting proof will improve your chance of the Judge
> granting your application.[65]

102.    Certificate applications to courts are lengthy and complicated and often require

legal assistance; however, the many individuals who either fail to apply at sentencing or whose

applications are denied must return to court months or years later when they no longer have

appointed counsel.  These individuals will either need to hire another lawyer or navigate the

certificate process themselves.

103.    Courts in New York County rarely grant certificates to eligible individuals at the

time of sentencing.  Instead, justices often summarily deny applications or allow applications to

languish indefinitely without a decision.

104.    DOCCS separately handles certificate applications for anyone convicted of a felony

who spends any time in state prison, has two or more felony convictions, or has an out-of-state

conviction.  The DOCCS Certificate Application process is substantially longer, more intrusive

and burdensome, and no less unpredictable than the sentencing court process.

---

[65] N.Y. State Unified Court System, *Applying to Court for a Certificate of Relief from Civil Disabilities*, https://www.nycourts.gov/courthelp/criminal/CRDApplication.shtml (last visited Dec. 5, 2022).

105.    A DOCCS Certificate Application requires, among other information, (a) residence history—including a list of everyone with whom the applicant lives and any time the applicant was homeless or lived in medical or other housing for the past two years; (b) employment history—including the name and address of each employer, the name of the applicant's supervisor, and the applicant's weekly salary; (c) legal history—including dates, courts, charges, and sentences for all out-of-state or federal convictions; (d) "social status" information—including the applicant's marital status, the name of any current or previous spouses (without any time limitation), and any roommates within the past two years; (e) information on all licenses the applicant holds; and (f) two character references.[66]   The applicant's signature on the form must be notarized.

106.    In addition, applicants must submit proof that they have paid income taxes for the two years immediately prior to the application and paid any fines or restitution set by the courts. If an applicant received public assistance, unemployment insurance, or Social Security benefits for any or all of the two-year period, they must include a printout from the agency showing all benefits received.   For any period where applicants had no reportable information, DOCCS requires a notarized document explaining how they supported themselves.

107.    After receiving all necessary records, DOCCS then assigns a parole officer to conduct an interview and home visit.   DOCCS advises that the parole officer "will want to see what you have been doing since your last conviction or release," and suggests providing (a) "a transcript or a letter from a teacher or school administrator"; (b) "a letter from a [job training] program supervisor or administrator"; (c) "letters from [employment] supervisors or other people

---

[66] N.Y. State Department of Corrections & Community Supervision, *Department of Corrections and Community Supervision Certificate of Relief from Disabilities - Certificate of Good Conduct Application and Instructions*, https://doccs.ny.gov/system/files/documents/2021/08/doccs-crd-application_instructions-word.pdf ("DOCCS Certificate Application") (last visited Dec. 5, 2022).

who worked with you"; (d) "a letter from a counselor, therapist or doctor" from any applicable counseling or social service program; (e) "[l]etters from Parole or Probation Officers"; (f) "[l]etters from Clergy"; and (g) "[l]etters from volunteer work."[67]  Obtaining the proper documents and references for certificate applications can consume significant time and resources from people who can least afford either.

108.   DOCCS does not publish any standards for granting a certificate application or provide any timeframe for ruling on an application.

109.   DOCCS is opaque as to the reasons for denying certificates, generally stating only that issuance would be inconsistent with the public interest.  Though the agency informs individuals they may reapply in two years' time, DOCCS does not provide any guidance concerning what an applicant may do to improve their chances of a certificate being granted on reapplication.

110.   For potential applicants in New York City, DOCCS identifies five organizations "who are familiar with the [certificate application] process and have experience assisting applicants," including Plaintiff Community Service Society; Neighborhood Defender Service of Harlem; Youth Represent; Bronx Defenders; and Legal Action Center.  These organizations each provide a wide range of programs and services to people involved with the criminal legal system all over New York City.  They have limited resources to devote to assistance with certificate applications and are generally able to help only a handful of the tens of thousands of Manhattan residents with felony convictions in their past—usually only those in danger of losing employment-related licenses.

---

[67] *Id.* at 3.

111.    Extremely few certificates are granted each year, particularly when compared to the size of the population with disqualifying felony convictions and the thousands added to their numbers each year.  On those occasions when certificates are granted, the certificate does not inform the recipient that their eligibility to serve on a jury has been restored.

112.    The vast majority of New Yorkers with felony convictions who are otherwise jury-eligible are unaware that their eligibility to serve on a jury can be restored or that certificates will restore their jury eligibility.  Some who are aware of certificates will not apply because of the confusing, burdensome, intrusive, and discretionary nature of the application process.  Some who do apply for a certificate will have their applications denied without the guidance from authorities or the support of counsel to reapply successfully.  Realistically, the vast majority of New Yorkers with felony convictions will never receive a certificate and will suffer the Exclusion's burden for the rest of their lives.

**The Exclusion Serves No Legitimate Purpose.**

113.    As a class, people with felony convictions are as capable of serving as jurors as any other group of citizens.  The Exclusion relies upon unsupported stereotypes about the moral character and fitness of people convicted of felonies.  These stereotypes are doubly inappropriate in Manhattan, given its history of racialized policing and prosecution.

114.    New York's *voir dire* process already provides for individualized screening of prospective jurors in civil trials, in criminal trials, and on grand juries.

115.    As the United States Supreme Court has explained, "*Voir dire* provides a means of discovering actual or implied bias and a firmer basis [than stereotyping] upon which the parties may exercise their peremptory challenges intelligently."[68]

---

[68] *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143-44 (1994).

116.   *Voir dire* offers courts and litigants an opportunity to gain individualized information about potential jurors and makes "reliance upon stereotypical and pejorative notions about a particular [group is] both unnecessary and unwise."[69]

117.   Non-felony offenses and conduct that more directly implicates an individual's fitness for jury service do not categorically disqualify Manhattan residents from jury service.  For example, a person can still serve on a jury after being convicted for tampering with a juror in the first degree, a misdemeanor conviction that includes a finding of "communicat[ing] with a juror" with "intent to influence the outcome of an action or proceeding."

118.   Other examples abound: Lawyers suspended from the bar for making "demonstrably false and misleading statements,"[70] police officers who are not disciplined (let alone criminally charged) for dishonesty,[71] politicians who abuse their offices,[72] and those with enough money[73] or political clout to avoid criminal sanction for their wrongdoing are among those

---

[69] *Id.* at 143.

[70] *See, e.g.*, Nicole Hong et al., *Court Suspends Giuliani's Law License, Citing Trump Election Lies*, N.Y. Times (June 24, 2021), https://www.nytimes.com/2021/06/24/nyregion/giuliani-law-license-suspended-trump.html.

[71] *See, e.g.*, Jeff Coltin, *NYPD officers are supposed to be fired for lying. They aren't.*, City & State New York (Apr. 11, 2022), https://www.cityandstateny.com/policy/2022/04/nypd-officers-are-supposed-be-fired-lying-they-arent/365517/ ("[T]he city's police watchdog agency found that 181 NYPD officers had lied to the board in the past decade, and not a single one was fired for it.  And just five cops were sanctioned at all for the downgraded charge of 'misleading.'").

[72] *See, e.g.*, Gwynne Hogan & Brigid Bergin, *State Assembly Report Finds Cuomo Used State Resources to Enrich Himself*, Gothamist (Nov. 22, 2021), https://gothamist.com/news/state-assemblys-report-cuomo-confirms-sexual-harassment-misuse-state-resources-lack-transparency-about-nursing-home-death-toll ("A long awaited report from the New York State Assembly finds former governor Andrew Cuomo sexually harassed multiple women, used state resources for his own personal benefit while drafting his memoir in violation of state ethics laws, and withheld information from the public regarding the deaths of nursing home residents from COVID.").

[73] *See, e.g.*, Karen Matthews, *Manhattan DA Returns Artifacts Worth $20 Million to Greece*, Associated Press (Feb 23, 2022), https://apnews.com/article/business-middle-east-arts-and-entertainment-crime-new-york-f14029b06954f89e0641a4a6f28319a9 (reporting that a billionaire hedge fund manager would not face criminal charges despite illegally acquiring $70 million worth

who are not categorically barred from jury service but instead receive individualized consideration for jury service through *voir dire*.

119.    Those who show callous disregard for the right and obligation of jury duty, including by ignoring five jury summonses over the course of decade and incurring a fine, do not lose their eligibility for jury service.[74]  Instead, they maintain their eligibility for jury service and receive individual screening through *voir dire*.

120.    Given *voir dire*, no justification exists for New York to disqualify all individuals with felony convictions.

121.    That New York's indefinite exclusion of people with felony convictions is not required to provide an effective jury system is demonstrated by the fact that twenty-one states and the District of Columbia rely on *voir dire* to determine whether individuals with felony convictions are fit to serve on juries, rather than presuming that they are unfit to do so.

122.    These states either never exclude people with felony convictions from jury service or provide for automatic restoration of eligibility after a set time.  Maine does not ever bar otherwise-eligible citizens from jury service because of a criminal conviction.  Indiana and North Dakota exclude incarcerated citizens, but otherwise permit jury service regardless of conviction record.  Alaska, Illinois, Idaho, Iowa, Minnesota, Montana, New Mexico, North Carolina, Ohio, Rhode Island, South Dakota, Washington, and Wisconsin exclude citizens with felony convictions only during the term of sentence.  Illinois, Idaho, and Iowa permit citizens with felony convictions

---

of artifacts through "a sprawling underworld of antiquities traffickers, crime bosses, money launderers and tomb raiders").

[74] *See, e.g.*, Jonathan Chew, *Donald Trump Reports for Jury Duty Today*, Fortune (Aug. 17, 2015), https://fortune.com/2015/08/17/donald-trump-jury-duty/ ("Manhattan County Clerk Milton Tingling agreed to let Trump report for duty today after his lawyers assured him that this would be a convenient time. . . . A Manhattan judge earlier this year fined the Republican presidential frontrunner $250 for ignoring five jury summons since 2006.").

to serve after they complete their sentence but permit for-cause challenges based on the fact of conviction.  Finally, Connecticut, Kansas, Massachusetts, Nevada, Oregon, and the District of Columbia each exclude citizens with felony convictions for the duration of their sentences and then only for a finite time period after the completion of sentence.

123.    The availability of *voir dire* makes the Exclusion superfluous and deprives New York courts of fair and impartial potential jurors.

### The Exclusion Disserves the Interests of Justice.

124.    The Exclusion unnecessarily reduces the size and racial diversity of the jury pool in Manhattan.  As Judge Tingling has recognized, the systematic exclusion of Black people from the jury pool reduces public confidence in jury verdicts and the legal system generally.[75]  Extensive academic research supports the conclusion that more diverse juries enhance the quality of deliberations and confidence in the legal system.  Moreover, the Exclusion undermines the state's interest in the successful rehabilitation and reintegration of people with felony convictions.

*The Exclusion's Adverse Impact on Jury Diversity Undermines the Fairness of Juries and the Perception that the System is Just.*

125.    As the New York State Judicial Commission on Minorities found over 30 years ago, there "is reason to believe that minority underrepresentation affects jury outcomes in ways that disadvantage minority litigants."[76]

126.    Research on felony trials, including trials in New York, has found that minority underrepresentation disadvantages Black criminal defendants.  For instance, the greater the

---

[75] *See* Judge Milton A. Tingling, *Jury Duty Is a Right and a Privilege*, *supra* note 10.

[76] *Report of the New York State Judicial Commission on Minorities*, 19 Fordham Urb. L.J. 181, 242 (1991).

percentage of white people on a jury, the more likely that jury would convict a Black defendant.[77]

Increasing jury diversity helps cure this disadvantage.   Research also reveals that, before

deliberation, white jurors on diverse mock juries were less likely to believe that a Black defendant

was guilty than were white jurors on all-white juries.[78]

127.    Jury diversity also improves the deliberative performance of juries.  For a mock

assault trial involving a Black defendant, diverse juries deliberated longer, were more accurate in

their case related statements, and discussed a wider range of evidence than did all-white juries.[79]

128.    On diverse juries, white jurors raised more novel trial facts, made fewer factual

errors, and were more amenable to discussions of race-related issues during deliberations than

white jurors on racially homogenous juries.[80]

129.    Jury diversity improves the deliberations for Black defendants and litigants without

negatively affecting the deliberations for white defendants and litigants.[81]

130.    Increased jury diversity diminishes the risk of wrongful convictions.

131.    The representativeness of juries also influences public confidence in the fairness of

the legal system.  Jury diversity is particularly important in shaping the perceived legitimacy of

convictions—where the public looks to the procedural fairness of a jury verdict when determining

whether the outcome is legitimate.   When trials result in convictions, both Black and white

---

[77] Marian R. Williams & Melissa W. Burek, *Justice, Juries, and Convictions: The Relevance of Race in Jury Verdicts*, 31 J.  Crime Just. 149, 149-69 (2008).

[78] Samuel Sommers, *Racial Diversity and Decision Making,* 90 J. Personality Soc. Psychol. 597, 603-04 (2006).

[79] *Id.* at 604-06.

[80] *Id.*

[81] Liana Peter-Hagene, *Jurors' Cognitive Depletion and Performance During Jury Deliberation as a Function of Jury Diversity and Defendant Race*, 43 L. & Hum. Behav. 232, 241 (2019).

individuals perceive a verdict reached by a diverse jury as significantly fairer than a verdict reached by an all-white jury.[82]

*The Exclusion Hinders Rehabilitation and Reintegration.*

132.   The Exclusion undermines the state's interest in the successful rehabilitation and reintegration of people with felony convictions.

133.   In recently enacting legislation to restore the right of electoral suffrage to people automatically upon release from prison, New York State recognized that "facilitating reentrance in the voting process should be an essential component of rehabilitation and reintegration" and contributes to the goal of "prevent[ing] individuals from straying from the confines our laws and society's norms."[83]   The same is true of jury service.   It is contradictory at best to put people with felony convictions through the "rehabilitation" process only to frustrate their successful reintegration as active citizens in our democracy by preventing them from serving on a jury.

134.   As then-Manhattan District Attorney Cyrus Vance Jr. wrote in support of the legislation that automatically restored the voting rights of people convicted of felonies upon release from prison: "[D]isenfranchising New Yorkers who have fully paid their debt violates foundational principles of our state's criminal laws, as well as basic humanity and dignity."[84] Indeed, an express legislative purpose of the Penal Law is "the rehabilitation of those convicted" and "the promotion of their successful and productive reentry and reintegration into society."[85]

---

[82] *E.g.*, Leslie Ellis & Shari S. Diamond, *Race, Diversity, and Jury Composition: Battering and Bolstering Legitimacy*, 78 Chi.-Kent L. Rev. 1033 (2003).

[83]         Justification         Memo,         N.Y.         Senate         Bill         S.830B, https://www.nysenate.gov/legislation/bills/2021/S830.

[84] Letter from Cyrus R. Vance Jr., District Attorney, County of New York, to Senate Majority Leader Andrea Stewart-Cousins and Assembly Speaker Carl Heastie (Feb. 11, 2021), https://www.brennancenter.org/sites/default/files/2021-02/Vance.pdf.

[85] N.Y. Penal L. § 1.05(6).

135.    Former District Attorney Vance further wrote that the state's disenfranchisement scheme "works against [his office's] mission [to ensure a safer New York and a fairer justice system] by imposing a grave collateral consequence on formerly incarcerated New Yorkers—one that strips them of core democratic rights, and renders them second class citizens."[86] These statements are at least as true for the Exclusion's ban on jury service, which continues even after New Yorkers "have fully paid their debt."   Even sealed felony convictions—for example, convictions that are over 10 years old where the person has not committed any other crime since then—disqualify New Yorkers from jury service.

136.    Enjoining the Exclusion would alleviate some of the effects of what the New York State Special Committee on Collateral Consequences of Criminal Proceedings called "civil death," including "restrictions on civic participation, such as restrictions on the right to vote and prohibitions on jury service."[87]   As that committee reported: "Besides adding another layer of separation between such persons and society while they are in prison, enforcing such restrictions upon release sends a message that their contributions to society are no longer welcome and that the consequences of their conviction will last far beyond their sentence."[88]

137.    For many people convicted of felonies, civic engagement—including through political participation such as voting and jury service—is a critical means to facilitate sustainable reintegration back into society.[89]   For example, scholars have found that "post-release adjustment

---

[86] Letter from Cyrus R. Vance Jr, *supra* note 87.

[87] Special Committee on Collateral Consequences of Criminal Proceedings, *Re-Entry and Reintegration: The Road to Public Safety: Report and Recommendations of the Special Committee on Collateral Consequences of Criminal Proceedings* 299 (New York State Bar Association, May 2006), https://static.prisonpolicy.org/scans/CollateralConsequencesReport.pdf.

[88] *Id.*

[89] *See* Christopher Uggen et al., *Citizenship, Democracy, and the Civic Reintegration of Criminal Offenders*, 605 Annals Am. Acad. Pol. & Soc. Sci. 281 (2006).

is inhibited by restrictions on occupational licensing and employment opportunities, loss of parental rights, and prohibition from holding elective office or serving on juries—as well as other forms of formal and informal social stigma. Because personal and civic identity is largely determined by the relative strength of our ties to various social institutions, such restrictions greatly diminish the reintegrative capacity of persons formerly under correctional supervision."[90]

138. Whether from electoral suffrage or jury service, disenfranchisement of people convicted of felonies "alienat[es] the ex-offender from the civic processes that signify membership in the community."[91]

### The Exclusion Has Injured the Plaintiffs.

*Daudi Justin*

139. In 2001, Plaintiff Daudi Justin moved to New York City from Los Angeles after coming out as gay to his conservative, religious family. Upon reaching New York, Mr. Justin was alone and depressed, and fell into a social circle of people who used drugs recreationally.

140. In 2007, approximately eight New York Police Department officers barged into Mr. Justin's Chelsea apartment with guns pointed at him while executing a search warrant. Mr. Justin was arrested after officers found a quantity of methamphetamine in the apartment that qualified for a felony possession offense under the Rockefeller Drug Laws but today is classified as only a misdemeanor.

141. While the majority of individuals Mr. Justin knew who used methamphetamines were white and while Chelsea is a predominantly white neighborhood, Mr. Justin was to his

---

[90] Gordon Bazemore & Jeanne Stinchcomb, *A Civic Engagement Model of Reentry* 23, Fed. Probation (Sept. 2004), https://www.uscourts.gov/sites/default/files/fed_probation_sept_2004.pdf.

[91] *See* Bryan Lee Miller & Joseph F. Spillane, *Civil Death: An Examination of Ex-Felon Disenfranchisement and Reintegration*, 14 Punishment & Society 402, 409 (Oct. 2012).

knowledge the only one arrested out of the people he knew.  This is consistent with policing practices during that time.  In 2007, there were nearly 24,000 arrests of adults for drug offenses in Manhattan.  Black people accounted for over 50 percent of those arrests even though they constituted less than 13 percent of the County's adult population.  By contrast, white people accounted for just over 11 precent of arrests, even though they constituted over 50 percent of the County's adult population.

142.    In 2009, Mr. Justin pled guilty to criminal possession of a controlled substance in the third degree.  To induce this plea, Manhattan prosecutors offered Mr. Justin a sentence of two years and told him that he could be released after 6 months if he participated in a prison-based drug treatment program.  The prosecutors also threatened Mr. Justin with ten to twenty years in prison if he did not plead guilty.

143.    In 2009, there were nearly 10,000 convictions of adults for drug offenses in New York County.  Black people accounted for nearly 60 percent of those convictions even though they constituted less than 13 percent of the County's adult population.  By contrast, white people accounted for approximately 7 percent of convictions, even though they accounted for over 50 percent of the County's adult population.

144.    Mr. Justin was sentenced to a term of two years imprisonment and two years of post-release supervision.  When Mr. Justin entered prison, he became aware of the depth of the racialized nature of mass incarceration.  The prisons, especially the dorms where the men would be housed, were so overwhelmingly Black and Latinx that it was surprising to see white men.  Contrary to stereotypes of incarcerated people, the individuals he met were caring and looked out for each other.  He eventually became a dorm leader.  These experiences led to his desire to become a public defender.

145.    While in prison, Mr. Justin participated in a prison-based, drug-treatment program, as prescribed by his plea deal.  That program subjected him to undue physical and emotional abuse, and he did not complete it.  Mr. Justin's experience was typical, and New York has since closed that program—and others—amid reports of abuse.[92]

146.    Instead of 6 months, Mr. Justin served 23 months in prison.  After reaching his conditional release date, he was released from prison, and he finished his term of supervised release early.

147.    Mr. Justin was convicted and sentenced over a decade ago.  Nonetheless, he continues to suffer the civil consequences of his felony conviction to this day, including deprivation of his eligibility to serve on a jury.

148.    After his release from prison, Mr. Justin enrolled in the Borough of Manhattan Community College and received his associate's degree with honors before matriculating to Columbia University in 2016.  Mr. Justin graduated from Columbia in 2018 with a bachelor's degree in political science.  He then attended law school at the City University of New York School of Law.  Before graduating from CUNY Law in 2021, Mr. Justin interned with Judge Jenny Rivera of the New York Court of Appeals and Justice Ellen Gesmer of the Appellate Division of the Supreme Court of New York, First Department.

149.    Mr. Justin was admitted to practice law in New York State in June 2022.  Before licensing him, the First Department found that he "possesses the character and general fitness requisite for an attorney and counsellor-at-law."   He is currently a public defender with

---

[92] *See* Keri Blakinger, *'A Humiliating Experience': Prisoners Allege Abuse at Discipline-focused 'Shock' Camps*, The Marshall Project (Feb. 24, 2022), https://www.themarshallproject.org/2022/02/24/a-humiliating-experience-prisoners-allege-abuse-at-discipline-focused-shock-camps.

Neighborhood Defender Service of Harlem, representing clients before the very courts that bar him from serving as a juror.

150.    After Mr. Justin regained his eligibility to vote at the end of his sentence, he re-registered to vote and has voted regularly in elections since then.

151.    Mr. Justin wants to be able to serve on a jury in New York County.  After serving nearly two years in prison, Mr. Justin has a deeper appreciation for his duties, rights, liberties, and role in the democratic process.  While at Columbia, Mr. Justin wrote an article for the Morningside Review on the exclusion of people with felony convictions from the jury system entitled *No Justice in Felon Jury Exclusion*.  He wrote, "I have become a passionate advocate for civic engagement, professing its significance to anyone who will listen, and often even to those who won't, which is why I was disheartened and exasperated when I learned that I am permanently banned from serving on a jury."

152.    Mr. Justin does not have a certificate restoring his right to serve on a jury.  At one point, he considered applying for record relief but ultimately did not do so after learning how burdensome and intrusive the process is.  After spending time in prison, Mr. Justin does not want to be subjected to further personal exposure to DOCCS, including a home visit from a DOCCS official and allowing DOCCS to root through the substantial amount of very personal information that is typically part of Certificate applications.  Additionally, Mr. Justin firmly believes that formerly incarcerated people should not be disenfranchised from the community and be forced to go through an onerous, intrusive, and discretionary process to restore their civic rights.

153.    Mr. Justin's exclusion from jury service relegates him—as well as all other people convicted of felonies—to second-class citizenship.  He wants an opportunity to participate in the administration of the law that is equal to other residents of Manhattan.  Because of his prior

conviction, he is barred from doing so.  Indeed, on two occasions he received jury questionnaires while living in Manhattan.  On one occasion he had to indicate that he was convicted of a felony and therefore disqualified.  To make matters worse, he was asked to provide the commissioner of jurors with evidence of his felony conviction to prove that he was disqualified.  He did so.

*Community Service Society of New York*

154.    The Community Service Society of New York ("CSS") has worked with and for New Yorkers since 1843 to promote economic opportunity and champion an equitable city and state.  CSS recognizes the impact of incarceration that wreaks havoc on families, communities, and individual lives.  CSS operates programs to help individuals and families rebuild after incarceration.  A core part of CSS's mission is supporting individuals with conviction histories to overcome barriers to civic participation, employment, and housing through research, direct services, litigation, and advocacy.  CSS recognizes that a successful transition from incarceration back into the community is crucial to breaking the cycle of poverty and recidivism.

155.    Structural obstacles to productive citizenship, including the Exclusion, "greatly diminish the reintegrative capacity of persons formerly under correctional supervision"[93] and therefore frustrate CSS's mission of achieving sustainable integration for the people with felony convictions that the organization serves.

156.    CSS's legal department works exclusively with and for individuals with conviction histories, using a multi-pronged approach to helping individuals overcome the barriers a conviction record creates.  The legal department's Next Door Project helps individuals obtain, correct mistakes in, and understand their rap sheets.  CSS attorneys provide "Know Your Rights" trainings, which include discussion of Certificates and their role in restoring juror eligibility.

---

[93] Bazemore & Stinchcomb, *A Civic Engagement Model of Reentry*, at 23.

157.    DOCCS identifies CSS as one of five organizations in New York City "who are familiar with the process and have experience assisting applicants" with Certificates.[94]

158.    CSS's legal department dedicates its time to providing advice, direct services, administrative and legislative advocacy, and litigation representation for individuals with conviction histories.  On average CSS provides two or three "Know Your Rights" trainings, as discussed above, per month.  These trainings have been presented virtually or in-person at New York County-based nonprofit partner agency offices, New York City Department of Probation offices, the Southern District of New York courts (RISE Court and Life Skills courses), and other locations.  Approximately 10 to 20 individuals generally attend each training.  Pre-COVID those numbers were even higher, ranging from 20 to 30 attendees at each training.  The training includes discussion of and educational materials about Certificates and their usefulness in allowing individuals with felony convictions to overcome the statutory barrier to serving on a jury.

159.    In 2021, CSS assisted 40 people across New York City with the Certificates application process.  By contrast, that same year, more than 4,000 people were convicted of felonies in state courts in New York City, including 1,763 in Manhattan alone.

160.    CSS diverts resources—including money and staff time—in order to help individuals understand and comply with the Exclusion.  CSS's work includes (a) educational flyers about the process of responding to jury questionnaires and (b) dedicating parts of its training sessions to presenting information about jury eligibility for people with conviction histories.  If the Exclusion were enjoined, CSS would redirect the resources it expends on those flyers and those portions of its trainings to other support services for individuals with conviction histories.

---

[94] DOCCS Certificate Application at 4.

**Judge Tingling**

161.    Judge Tingling is the County Clerk of New York County and Commissioner of Jurors for the Supreme Court, New York County, for both the Civil and Criminal Branches.  Judge Tingling was appointed to this position in November 2014.  Section 502 of the Judiciary Law designates the county clerks in New York City as jury commissioners and requires them to "take any steps necessary to enforce the laws and rules relating to the drawing, selection, summoning and impanelling of jurors."  Section 509 of the Judiciary Law designates the Commissioner of Jurors as the official required to "determine the qualifications of a prospective juror on the basis of information provided on the juror's qualification questionnaire."  Section 509 also requires the Commissioner of Jurors to maintain "a record of the persons who are found not qualified or who are excused, and the reasons therefor . . . ."

162.    Judge Tingling is the founder of The Initiative, a volunteer project in collaboration with the New York County Lawyers Association that educates, facilitates, and assists formerly incarcerated individuals in obtaining Certificates.[95]  The Initiative also "educates the formerly incarcerated on voting rights while registering eligible individuals to vote."

163.    Judge Tingling is the first and only Black County Clerk and the first Black Commissioner of Jurors in any county in New York State.

164.    Prior to his service as County Clerk and Commissioner of Jurors, Judge Tingling served as a Justice of the Supreme Court, New York County.  Judge Tingling has also served as a judge in the New York City courts, presiding over both civil and criminal cases.

---

[95] *Federal and State Bench/Bar Celebrate Hon. Milton A. Tingling's Life*, N.Y. Carib News (Nov. 3, 2021), https://www.nycaribnews.com/articles/federal-and-state-bench-bar-celebrate-hon-milton-a-tinglings-life/.

165.    Judge Tingling was admitted to the practice of law in New York in 1983 and established a solo practice based in Harlem.  Judge Tingling has practiced in criminal, civil, and family court.  Judge Tingling resides in New York County, where he was also born and raised.

## CLASS ALLEGATIONS

166.    Plaintiff Daudi Justin brings this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of himself and a class of all other persons similarly situated.

167.    Mr. Justin seeks to represent the following class:

All Black people who are disqualified from jury service under the Exclusion due to a felony conviction but would be otherwise eligible to serve on state court juries in New York County.

168.    Mr. Justin also seeks to represent the following subclass:

All Black men who are disqualified from jury service under the Exclusion due to a felony conviction but would be otherwise eligible to serve on state court juries in New York County.

169.    Mr. Justin is an adequate representative of both the proposed class and the proposed subclass.

170.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  Tens of thousands of Black people are within the class, and many more will become class members.

171.    The proposed subclass satisfies the requirements of Rule 23(a)(1) because the subclass is so numerous that joinder of all members is impracticable.  Tens of thousands of Black men are within the subclass, and many more will become subclass members.

172.    The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2).  The members of the class are subject to disqualification from jury service in New York County due to a felony conviction they received at some time in their lives.  The lawsuit raises

numerous questions of law common to members of the proposed class, including whether the Exclusion, as applied in New York County, violates class members' rights under the Sixth and Fourteenth Amendments to the United States Constitution.

173.    The subclass meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2).  The members of the subclass are subject to disqualification from jury service in New York County due to a felony conviction they received at some time in their lives.  The lawsuit raises numerous questions of law common to members of the proposed class, including whether the Exclusion, as applied in New York County, violates subclass members' rights under the Sixth and Fourteenth Amendments to the United States Constitution.

174.    The class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because Mr. Justin's claims are typical of the claims of the class and the subclass.  Mr. Justin and the proposed class members are all Black people who have been convicted of felonies and would be eligible to serve on a jury in the state courts of New York County but are disqualified under the Exclusion due to a past felony conviction.  Mr. Justin and the proposed class also share the same legal claims, which assert the same rights under the Sixth and Fourteenth Amendments to the United States Constitution.

175.    The proposed subclass meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because Mr. Justin's claims are typical of the claims of the subclass.  Mr. Justin and the proposed subclass members are all Black men who have been convicted of felonies at some time in their lives and would be eligible to serve on a jury in the state courts of New York County but are disqualified under the Exclusion due to a past felony conviction.  Mr. Justin and the proposed subclass also share the same legal claims, which assert the same rights under the Sixth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

176.    This Court has subject-matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

177.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in this district and because the defendant maintains his office in this district.

## CAUSES OF ACTION

### First Cause of Action

178.    Defendant's actions violate the Sixth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### Second Cause of Action

179.    Defendant's actions violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that this Court:

A.    Assume jurisdiction over this matter;

B.    Certify a class of all Black people who are disqualified from jury service under the Exclusion due to a felony conviction but would be otherwise eligible to serve on state court juries in New York County;

C.    Certify a subclass of all Black men who are disqualified from jury service under the Exclusion due to a felony conviction but would be otherwise eligible to serve on state court juries in New York County;

D.    Declare that the application of Section 510(3) of the New York Judiciary Law in

New York County is unconstitutional in violation of the Sixth and Fourteenth Amendments to the United States Constitution;

E.    Declare that the application of Section 510(3) of the New York Judiciary Law in New York County and/or to Mr. Justin, the class, and/or the subclass is unconstitutional in violation of the Sixth and Fourteenth Amendments to the United States Constitution;

F.    Enjoin the defendant from enforcing Section 501(3) of the New York Judiciary Law in New York County;

G.    Award the plaintiffs attorneys' fees and costs; and

H.    Grant any other relief the Court deems appropriate.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES
UNION FOUNDATION

_____
Perry M. Grossman
Daniel R. Lambright
Lanessa L. Owens-Chaplin*
Christopher T. Dunn
125 Broad Street
New York, New York 10004
Phone: (212) 607-3300
pgrossman@nyclu.org
dlambright@nyclu.org
lchaplin@nyclu.org
cdunn@nyclu.org

CLARICK GUERON
REISBAUM LLP

_____
Isaac B. Zaur
Royce L. Zeisler
Amanda J. Wong
220 Fifth Avenue
14th Floor
New York, New York 10001
Phone: (212) 633-4310
izaur@cgr-law.com
rzeisler@cgr-law.com
awong@cgr-law.com

*Application for admission to S.D.N.Y. forthcoming

On the complaint: Ifeyinwa K. Chikezie

Dated: December 8, 2022