UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DAUDI    JUSTIN,    and    all    others
similarly situated, and THE COMMUNITY
SERVICE SOCIETY OF NEW YORK,

              Plaintiffs,            **MEMORANDUM AND ORDER**

       - against -            22 Civ. 10370 (NRB)

MILTON    ADAIR    TINGLING,    in    his
official capacity as County Clerk of
New York County and Commissioner of
Jurors,

             Defendant.
------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Daudi Justin ("Justin") and the Community Service Society of New York ("CSS," and together with Justin, "plaintiffs") bring this action challenging Section 510(3) of New York's Judiciary Law ("Section 510(3)"). Plaintiffs' claims are narrow, alleging that Section 510(3), which disqualifies convicted felons from serving on juries, is unconstitutional <u>only</u> as applied in New York County under the Equal Protection Clause of the Fourteenth Amendment.[1] ECF No. 46 ("FAC"). Notably, plaintiffs do not allege

---

[1] Plaintiffs also asserted a claim under the Sixth Amendment in their original complaint, ECF No. 1, and have re-pled that claim in their First Amended Complaint, ECF No. 46. Both parties acknowledge that the Court has already dismissed plaintiffs' claims arising under the Sixth Amendment. ECF No. 29; ECF No. 51 ("Mot.") at 9; ECF No. 54 ("Opp.") at 8 n.1. Plaintiffs replead their Sixth Amendment claim in the First Amended Complaint to preserve the argument for appellate purposes. Opp. at 8 n.1. For the avoidance of doubt, the Court dismisses plaintiffs' claims under the Sixth Amendment in the FAC for the reasons addressed in our prior Memorandum and Order. <u>Justin v. Tingling</u>, 712 F. Supp. 3d 462 (S.D.N.Y. 2024).

that Section 510(3) is unconstitutional on its face.  For the reasons set forth below, the Court concludes that plaintiffs' claims fail as a matter of law and grants defendant's motion to dismiss in full.

## BACKGROUND

### A. The Parties

Justin is a Black man who resides in Manhattan and works as a lawyer in Harlem.  FAC ¶¶ 10, 171.  Justin is a member of the bar of the State of New York.  Id. ¶ 10.  In 2009, Justin was convicted of a felony after pleading guilty to criminal possession of a controlled substance in the third degree.  Id. ¶ 164.  He alleges that since that time, he has received jury questionnaires on two occasions.  Id. ¶ 175.  On one of those occasions, Justin was required to disclose that he had a past felony conviction and was therefore disqualified from jury service.  Id.  Justin acknowledges that he has chosen not to avail himself of New York's process for restoring jury service eligibility[2] "after learning

---

[2]    As this Court previously discussed in its January 23, 2024 Memorandum and Order, Justin, 712 F. Supp. 3d at 466, n.1, individuals like Justin who have only one felony conviction can have their jury eligibility restored by applying for and obtaining a Certificate of Relief from Disabilities ("CRD") or a Certificate of Good Conduct ("CGC"), while those with more than one felony conviction can only seek a CGC.  See N.Y. State Unified Court System, Getting Rights Back, https://www.nycourts.gov/courthelp/criminal/gettingRightsBack.shtml (last visited February 7, 2026).  The Commissioner of Jurors maintains discretion in determining whether a convicted felon may re-enter the jury pool even if he obtains a CRD or CGC.  FAC ¶ 116; 1991 N.Y. Op. Att'y Gen. No. 91-F10, 1991 WL 499877, at *4-5 (N.Y.A.G. Dec. 31, 1991).

how burdensome and intrusive the process is," and because "[a]fter spending time in prison, [he] does not want to be subjected to further personal exposure to" the Department of Corrections and Community Supervision ("DOCCS"), the agency that would be responsible for granting Justin's CRD or CGC.  FAC ¶ 174.[3]

CSS is a non-profit organization headquartered in Manhattan that supports individuals with past convictions in New York County "to overcome barriers to civic participation, employment and housing through research, direct services, litigation, and advocacy."  Id. ¶¶ 11, 178.  CSS alleges that its "work includes (a) educational flyers about the process of responding to jury questionnaires and (b) dedicating parts of its training sessions to presenting information about jury eligibility for people with conviction histories."  Id. ¶ 184.

Defendant Milton Tingling ("Tingling" or "defendant"), a former justice of the Supreme Court, New York County, is currently the County Clerk of New York County and Commissioner of Jurors for the Supreme Court, New York County.  Id. ¶¶ 185, 188.  In this capacity, he is responsible for enforcing "the laws and rules

---

[3]    Given that Justin is a member of the bar of the State of New York and that he has been found by the Appellate Division of the Supreme Court of New York, First Department to "possess[] the character and general fitness requisite for an attorney and counsellor-at-law," FAC ¶¶ 10, 171; see also N.Y. Jud. Law § 90(1)(a), it seems likely that Justin would be granted a CRD or CGC if he were to apply for one.  Justin's decision not to apply, and therefore not to restore his eligibility for jury service, raises issues of whether Justin would be an appropriate class representative, should this case ever be certified as a class action, which need not be resolved at this time.

-3-

relating to the drawing, selection, summoning and impanelling of jurors." Id. ¶ 185.

**B. The Lawsuit**

On December 8, 2022, plaintiffs filed this putative class action against defendant in his official capacity challenging the constitutionality of Section 510(3) of New York's Judiciary Law, which disqualifies individuals with felony convictions from serving on a jury, as it is applied only in New York County.[4] FAC. Plaintiffs claim that Section 510(3) "causes the underrepresentation of Black people in the Manhattan [jury] pool" because of a local history of racialized policing and prosecution. FAC ¶¶ 39, 47–49; see also Opp. at 4–5, 10. As a result, plaintiffs allege that while 63,400 Black jurors served on Manhattan juries over the last decade, there would have been 17,100 additional Black jurors over the same period if not for the operation of Section 510(3). FAC ¶¶ 35–37; Opp. at 3.

Plaintiffs do not challenge the constitutionality of Section 510(3) on its face, nor do they challenge the constitutionality of Section 510(3) as it is applied in any other county in New York State. In other words, plaintiffs implicitly acknowledge that it

---

[4]    Section 510 provides in full that "[i]n order to qualify as a juror a person must: 1. Be a citizen of the United States, and a resident of the county. 2. Be not less than eighteen years of age. 3. Not have been convicted of a felony. 4. Be able to understand and communicate in the English language." N.Y. Jud. Law § 510.

is broadly constitutional to bar individuals with felony convictions from service on juries. Rather, plaintiffs seek a judicial declaration that Section 510(3) violates the Sixth and Fourteenth Amendments, as well as an injunction barring the enforcement of Section 510(3)'s jury service disqualification in New York County. FAC ¶¶ 57-58.

On January 20, 2023, this Court ordered the parties to brief whether plaintiffs have standing to bring this action, ECF Nos. 18, 20. After considering the merits of the briefing, the Court dismissed plaintiffs' claims under the Sixth Amendment for lack of standing. Justin v. Tingling, 712 F. Supp. 3d 462 (S.D.N.Y. 2024). Specifically, the Court made the following findings: first, Justin lacked direct standing under the Sixth Amendment because Justin, "who is not a criminal defendant, lacks a 'legally protected interest' necessary to establish an injury in fact for a Sixth Amendment claim." Id. at 468-71. Second, CSS lacked organizational standing under the Sixth Amendment because, like Justin, it did not "suggest that it is or will become a criminal defendant, and therefore it has no legally cognizable interest to protect under the Sixth Amendment." Id. at 471. Third, CSS did not have associational standing under the Sixth Amendment because it works "'exclusively' with formerly incarcerated individuals . . . and there is no indication that CSS represents or will

-5-

represent any criminal defendant who would be entitled to Sixth Amendment protections." Id. Finally, neither plaintiff had third-party standing under the Sixth Amendment because they lacked an injury in fact, and there could be no showing that there was any hindrance to any third party's ability to protect his or her own interests, as required to establish third party standing. Id. The Court, however, found that Justin did have standing under the Fourteenth Amendment and granted defendant's request for leave to file a motion to dismiss plaintiffs' remaining claims under Federal Rule of Civil Procedure 12(b)(6). Id. at 471-72.

On February 22, 2024, defendant filed a motion to dismiss plaintiffs' remaining claims, ECF Nos. 30-32, which was fully briefed by April 8, 2024, ECF No. 35. Subsequently, both houses of the New York State Legislature passed the Jury of Our Peers Act (the "Act"), a bill that would have repealed Section 510(3) of the Judiciary Law and removed the ban on jury qualification for convicted felons throughout New York. See S.206A (N.Y. 2024); A.1432C (N.Y. 2024). Because enactment of the Act would have rendered this case moot, the Court denied defendant's motion to dismiss without prejudice to refiling if the Act did not become law by the end of 2024. ECF No. 36.

After the Act was not signed into law by the Governor, defendant refiled his motion to dismiss on January 22, 2025. ECF

-6-

Nos. 39-41.  On February 12, 2025, plaintiffs filed their FAC.
ECF No. 46.  Given the filing of the FAC, defendant's pending
motion to dismiss the original complaint was denied as moot, and
a briefing schedule was set for a motion to dismiss the FAC.  ECF
No. 49.  Pursuant to the briefing schedule, on March 26, 2025,
defendant filed the instant motion to dismiss the FAC.  ECF Nos.
50-52.  The motion was fully briefed as of May 16, 2025.  ECF No.
56.

## LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a non-
movant's pleading "must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on
its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim
has facial plausibility when the [pleaded] fact[s] . . . allow[]
the court to draw the reasonable inference that the [movant] is
liable for the misconduct alleged."  Id.  A court must accept as
true all factual allegations in the complaint and draw all
reasonable inferences in plaintiff's favor.  Acticon AG v. China
N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012).
However, "[t]hreadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not suffice."
Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014)

(quoting Iqbal, 556 U.S. at 678).

## **DISCUSSION**

It bears repeating that, as noted above, plaintiffs' claims in this case are narrow.  Plaintiffs are not making a facial challenge to Section 510(3)'s bar to jury service for individuals with felony convictions.  Nor are plaintiffs arguing that Justin, a member of the New York bar and Public Defender, FAC ¶ 171, would not be granted a CRD or CGC on the basis of his race if he applied for one, or that Justin would not be permitted to serve on a jury in New York County if he obtained a CGC or CRD.[5]  Further, plaintiffs do not argue that Section 510(3) is applied to exclude Black individuals with felony convictions from jury service, while White individuals with felony convictions are allowed to serve on juries.  Finally, plaintiffs do not allege that Black individuals who do not have felony convictions are disqualified from jury service under Section 510(3).  Instead, plaintiffs narrowly argue that Section 510(3)'s bar on jury service for individuals with felony convictions is unconstitutional as applied in New York County due to racialized police and prosecutorial practices.

In the discussion below, we address (1) whether the application of Section 510(3) in New York County constitutes

---

[5]    We note that there is no plaintiff in this case who is an individual with a felony conviction who applied for, but did not receive, a CGC or CRD.

intentional discrimination, and (2) if not, whether Section 510(3) satisfies the requirements of rational basis review.

**A. Applicable Law**

Plaintiffs challenge Section 510(3) under the Equal Protection Clause of the Fourteenth Amendment. Generally, state action challenged under the Equal Protection Clause of the Fourteenth Amendment is reviewed under the rational basis standard, whereby the state action will be upheld if it "bears some fair relationship to a legitimate public purpose." Plyler v. Doe, 457 U.S. 202, 216 (1982) ("In applying the Equal Protection Clause to most forms of state action, we . . . seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.").

Under rational basis review, precluding individuals with felony convictions from serving on juries is generally constitutional. United States v. Arce, 997 F.2d 1123, 1127 (5th Cir. 1993) ("excluding convicted felons from jury service does not violate the constitutional guarantee of equal protection"); cf. United States v. Foxworth, 599 F.2d 1, 4 (1st Cir. 1979) (rejecting a fair cross-section challenge to the disqualification from jury service of "persons convicted of . . . a crime punishable by imprisonment for more than one year" because it "is rationally based, and hence is not unconstitutional").

However, state actions that disadvantage a "suspect class" are subject to stricter scrutiny. Plyler, 457 U.S. at 216–17. While race is a "suspect class" to which strict scrutiny applies, Massachusetts Bd. Of Retirement v. Murgia, 427 U.S. 307, 312 n.4 (1976) (citing McLaughlin v. Florida, 379 U.S. 184 (1964)), individuals with a felony conviction do not qualify as a "suspect class," Hilliard v. Ferguson, 30 F.3d 649, 652 (5th Cir. 1994) ("convicted felons are not a constitutionally protected suspect class"); see also Arce, 997 F.2d at 1127 (rejecting an equal protection challenge to exclusion of individuals with felony convictions from federal juries under rational basis review). "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of race." Brown v. City of Oneonta, New York, 221 F.3d 329 (2d Cir. 2000).

Specifically, in the jury selection context, the question of whether a facially race-neutral jury selection criteria like Section 510(3) constitutes intentional discrimination is analyzed under the framework set forth in Castaneda v. Partida, 430 U.S. 482 (1977).[6]    In Castaneda, the Supreme Court provided that a plaintiff may "show that an equal protection violation has

---

[6]    See Opp. at 8 ("The parties agree that the appropriate framework for determining whether the application of facially race-neutral jury selection criteria amounts to intentional discrimination is established by Supreme Court's decision in Castaneda v. Partida").

occurred" by establishing (1) that the litigant is a member of an "identifiable group" that is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied"; (2) that the group is subject to "substantial underrepresentation"; and (3) that the substantial underrepresentation is due to "a selection procedure that is susceptible of abuse or is not racially neutral[.]" Id. at 494-95; accord Alston v. Manson, 791 F.2d 255, 257 (2d Cir. 1986). Once the above elements are satisfied and a substantial underrepresentation is shown, the litigant has "made out a prima facie case of discriminatory purpose, and the burden shifts to the State to rebut that case." Castaneda, 430 U.S. at 495.[7]

## B. Plaintiffs' Claims Under Castaneda

For purposes of this motion, there is no dispute that the first two prongs of the Castaneda test are satisfied. First, it is well established that Black people constitute a cognizable group

---

[7]    Outside of the jury selection context, plaintiffs can plead a claim for intentional discrimination on the basis of race in three ways: (1) a "plaintiff could point to a law or policy that expressly classifies persons on the basis of race"; (2) "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner"; and (3) a "plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by a discriminatory animus." Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000), overruled on other grounds by Gonzaga v. Doe, 536 U.S. 273 (2002) (internal citations and quotation marks omitted). Plaintiffs do not attempt to argue their claim under the City of Oneonta framework, but it is discussed at some length in defendant's motion. Mot. at 10-13. As such, the Court will briefly return to the City of Oneonta framework after analyzing plaintiffs' claims under Castaneda. See infra pp 25-28.

for Equal Protection purposes in the context of jury selection, Carter v. Jury Commission, 396 U.S. 320, 329-31 (1970), and are thus members of an "identifiable group" that is a "recognizable, distinct class," Castaneda, 430 U.S. at 494.  Defendant concedes as much in his motion.  Mot. at 14.  Plaintiffs separately argue that Black men also constitute a cognizable group for purposes of Equal Protection analysis.  FAC ¶ 1; Opp. at 9 n.2.  Defendant contests that argument in a footnote. Mot. at 14 n.5. For purposes of this motion, the Court will assume, without deciding, that Black men constitute a distinct cognizable group.

Turning to the second prong of the Castaneda analysis, defendant "does not address" whether Black individuals or Black men are subject to substantial underrepresentation for purposes of this motion. Mot. at 14 n.6.  Thus, the Court assumes for purposes of this motion that the second prong is satisfied.

It is therefore the third prong of the Castaneda analysis that forms the crux of the parties' debate.  Defendant argues that plaintiffs have not sufficiently alleged that New York's application of Section 510(3) is "susceptible of abuse or not racially neutral," as required by Castaneda.  The Court agrees.

## 1. Section 510(3) Is Racially Neutral

It is beyond dispute that Section 510(3) is racially neutral, and therefore constitutional, on its face.  As written, Section

-12-

510(3) requires that to "qualify as a juror a person must: . . . 3. Not have been convicted of a felony." N.Y. Jud. Law § 510(3).[8] The statute itself contains no classification of individuals on the basis of race.

In light of the statute's facial neutrality, plaintiffs rely on Alston v. Manson to meet the third prong of the Castaneda analysis. Alston v. Manson, 791 F.2d 255 (2d Cir. 1986). In Alston, a facially neutral jury selection framework was found not to be racially neutral because it had the "ineluctable effect" of reducing the number of potential jurors drawn from the cognizable class of individuals at issue. Id. at 257. Alston is clearly distinguishable.

In Alston, a challenge was brought against Connecticut's scheme for compiling the "jury array" in each Connecticut county. Id. at 256. At the time, each town in Connecticut provided prospective jurors to form its respective county's jury array. Id. Connecticut had "established a strict quota system" for the formation of the jury arrays, "which favored representation of the smaller towns" in each county, such that, for example, the smallest town in New Haven County contributed 4.2% of its adult population

---

[8]    The other qualifications to serve as a juror under New York law are that the individual must: "1. Be a citizen of the United States, and a resident of the county. 2. Be not less than eighteen years of age. . . [and] 4. Be able to understand and communicate in the English language."  N.Y. Jud. Law § 510.

to the jury array, while New Haven, the largest town in the county, contributed only 1.1% of its adult population to the array.  Id. It was "undisputed" in Alston "that a larger concentration of the black population in Connecticut live[d] in the more populated urban settings," thus the "ineluctable effect of the statutory scheme was to reduce the number of potential jurors drawn from large towns . . . where it [was] undisputed that a larger proportion of" Black residents lived.  Id. at 256-57.

Here, the alleged underrepresentation of Black individuals, including specifically Black men, with felony convictions is not "ineluctable."    Under    plaintiffs'    allegations,    the disproportionate exclusion of Black individuals and Black men with felony convictions is the product of the actions of third-party actors, namely, police and prosecutors.  See FAC ¶¶ 17-113.  Thus, the effect of the statute is necessarily variable depending on the actions of police and prosecutors.  In other words, if the rate at which Black and non-Black individuals are arrested and convicted of felonies were to change, so too would the effect of the statute.

Even accepting, for the purposes of this motion, plaintiffs' argument that New York police officers and New York prosecutors single out Black individuals for selective enforcement of the law and prosecution, Section 510(3) is not constitutionally infirm. As noted above, plaintiffs are not alleging that the individuals

-14-

barred from jury service by Section 510(3) have not been convicted of a felony. To be barred from jury service by operation of Section 510(3), an individual must have been found guilty of committing a crime, by way of either guilty plea or conviction after trial. Thus, to maintain eligibility to serve on a jury in New York county, an individual who is otherwise qualified to serve as a juror need only refrain from committing a felony. It cannot be said that the impact of Section 510(3) is ineluctable when an individual can avoid its application by simply abiding by the law.

Unlike Alston, the legislature has not enacted a "strict quota system" that "reduce[d] the number of potential jurors drawn from large towns . . . where it is undisputed that a larger proportion of [Black individuals] resided." Alston, 791 F.2d at 256–57. The effect of Section 510(3) is not ineluctable and is thus racially neutral.

## 2. Section 510(3) Is Not Susceptible of Abuse

Nor is Section 510(3) susceptible of abuse. Jury selection frameworks are susceptible of abuse when they "provide[] a clear and easy opportunity for racial discrimination." United States v. Scott, 545 F. Supp. 3d 152, 171 (S.D.N.Y. 2021). Plaintiffs argue that Section 510(3) is susceptible of abuse because it delegates an element of jury qualification, specifically, whether an individual has been arrested for, and convicted of, a felony, to

-15-

police and prosecutors.  Opp. at 14-16.  However, Section 510(3) does not delegate convictions to either the police or prosecutors. Therefore, regardless of any police or prosecutorial discretion, Section 510(3) can only disqualify an individual who has either pled guilty to a crime or has been found beyond a reasonable doubt to have committed a crime.

Further, the discretionary actors that are relevant to the Court's analysis of this issue are the individuals responsible for enacting Section 510(3) and assembling the jury venires in New York County, namely, New York legislators and the Commissioner of Jurors in New York County.  Plaintiffs have not plausibly alleged an abuse of discretion by either of those entities.

Plaintiffs do allege that New York law gives jury commissioners "discretion to decide whether a person with a felony conviction should be returned to the jury pool, even if they have received" a CRD or CGC.  FAC ¶ 116.  Nonetheless, beyond mere reference to the discretion afforded to jury commissioners, the FAC contains no allegations that the defendant in this case exercised his discretion in a racially discriminatory manner, for example, by returning White individuals or White men with felony convictions to the jury pool while refusing to return similarly situated Black individuals or Black men to the jury pool.  Such "threadbare recitals," Daikin Am., Inc., 756 F.3d at 225, of

-16-

discretion that could, hypothetically, be used in a discriminatory manner, do not suffice to show the system affords jury commissioners "a clear and easy opportunity for racial discrimination," Scott, 545 F. Supp. 3d at 171.

Plaintiffs further allege that sentencing courts and the DOCCS -- the authorities responsible for granting a CRD or CGC -- are afforded discretion in the granting of a CRD or CGC. FAC ¶¶ 116, 127. Again, plaintiffs do not even attempt to allege that either sentencing courts or the DOCCS, neither of which have been sued here, have abused that discretion to the detriment of Black individuals with felony convictions. Nor is there any plaintiff in this case who applied for a CRD or CGC and was denied by either the DOCCS or a sentencing court.

Plaintiffs rely on the holding in Castaneda to advance their position. In Castaneda, "a facially constitutional system of selecting grand jurors was found susceptible of abuse as applied in part because the system was 'highly subjective.'" Opp. at 15. The distinctions between Castaneda and this case are evident. In Castaneda, the Supreme Court considered whether Texas's system of selecting grand jurors violated the Fourteenth Amendment. Castaneda v. Partida, 430 U.S. 482 (1977). Under Texas's system, jury commissioners themselves selected individuals "from the citizens of different portions of the county to compose the list

-17-

from which the actual grand jury w[ould] be drawn." Id. at 484-85 (internal citations and quotation marks omitted). There, it was shown that while 79.1% of the relevant county's population was Mexican-American, "only 39% of the persons summoned for grand jury service were Mexican-American" over an 11-year period. Id. at 495. This, the court concluded, established a prima facie case of discrimination, which was supported by "the fact that the Texas system of selecting grand jurors [was] highly subjective" at the point of grand juror selection. Id. at 496-97. After the prima facie case of discrimination was established, "[i]nexplicably, the State introduced practically no evidence" to dispel the inference of intentional discrimination." Id. at 497-98.

No such subjectivity in the selection of jurors is alleged here. N.Y. Jud. Law § 510 sets out objective criteria for juror eligibility, providing that the individual must (1) be a citizen of the United States and a resident of the county; (2) be at least 18 years old; (3) not have been convicted of a felony; and (4) be able to understand and communicate in English. N.Y. Jud. Law § 510(1)-(4). Whether an individual has been convicted of a felony and is therefore ineligible for jury service is one of several objective criteria for jury eligibility. Unlike Texas's system in Castaneda, no subjective decision is required to determine a prospective juror's eligibility or lack thereof on this basis.

-18-

Plaintiffs also point to United States v. Scott to argue that "discretionary decisions by prosecutors can render a jury selection process to be susceptible to abuse." Opp. at 15 (citing United States v. Scott, 545 F. Supp. 3d 152, 172 (S.D.N.Y. 2021)). Scott is also distinguishable. In Scott, the court found that the jury selection process for an individual defendant was susceptible to abuse because "the practice of drawing proportionally fewer" prospective jurors from certain counties to form the master wheel of prospective jurors in White Plains, "cause[d] the [White Plains] Master Wheel to be made up of fewer individuals from counties with a higher percentage of Black and Latinx voters." Scott, 545 F. Supp. 3d at 171–72. The practice "parallel[ed] the facts of Alston, where the jury plan necessarily led to fewer jurors being selected from an area with a higher proportion of Black individuals." Id. at 172. Thus, the Scott prosecutor's use of "unfettered authority to opt to present [the] Defendant's case to a grand jury drawn from an unrepresentative White Plains Division," rather than the Manhattan Division, "constitute[d] a jury selection process which is susceptible to abuse." Id. There, the prosecutor was "provided a clear and easy opportunity to discriminate . . . by choosing White Plains–a subjective decision-making process that echoe[d] the suspect key-man system" in Castaneda. Id. Notably, in Scott, the Government "offer[ed] no

-19-

reason for its decision to indict [the defendant] in the White Plains Division." Id. at 173. "It [did] not argue, for example, that its decision in this case was made pursuant to some objective criteria or because of some non-discriminatory exigency." Id.

No such discretionary or subjective acts are alleged here. Defendant, as with all individuals involved in the selection of New York juries, has a non-discretionary and objective mandate from the state legislature to disallow individuals with felony convictions from jury service, unless they have had their jury eligibility restored.

In sum, plaintiffs have not adequately pled that New York's system of juror eligibility and selection is susceptible of abuse and have not made out even a prima facie case of intentional discrimination.

### 3. Defendant's Response

Even assuming arguendo that plaintiffs' allegations satisfy the Castaneda test and create a prima facie case of intentional discrimination, which they do not, defendant can still rebut the presumption of intentional discrimination by supplying "a plausible justification for the method of selecting jurors." United States v. Johnson, 21 F. Supp. 2d 329, 338 (S.D.N.Y. 1998); accord Castaneda, 430 U.S. at 494; Alston, 791 F.2d at 257; United

States v. Charles, 2021 WL 2457139, at *6 (S.D.N.Y. June 16, 2021).
Defendant has done so here.

There can be no serious argument that Section 510(3) lacks
a legitimate justification.  As plaintiffs acknowledge, Section
510(3) disqualifies only "people convicted of felonies from
serving on juries[.]"  FAC ¶ 1.  That disqualification serves, as
defendant maintains, the state's legitimate interest in upholding
the probity of its juries.

Defendant's justification is not just plausible, it is
established law.  Statutes similar to New York's that bar
individuals with felony convictions from jury service have been
repeatedly upheld.  Most notably, despite challenges, 28 U.S.C. §
1865(b), an analogous federal statute that bars anyone who "has
been convicted in a State or Federal court of record of, a crime
punishable by imprisonment for more than one year and" has not had
their civil rights restored, has repeatedly withstood challenge.
United States v. Arce, 997 F.2d 1123, 1127 (5th Cir. 1993)
("excluding convicted felons from jury service does not violate
the constitutional guarantee of equal protection" because the
government "has a legitimate interest in protecting the probity of
juries . . . [and] [e]xcluding convicted felons from jury service
is rationally related to achieving that purpose."); U.S. v.
Foxworth, 599 F.2d 1, 4 (5th Cir. 1979) ("Section 1865(b)(5) of

the Act disqualifies from jury service persons convicted of or charged with a crime punishable by imprisonment for more than one year whose civil rights have not been restored. This disqualification is intended to assure the 'probity' of the jury . . . It is rationally based, and hence is not unconstitutional.") Similar exclusions at the state and local levels have been upheld as well. Hale v. Shoop, 2021 WL 1215793, at *19–20 (N.D. Ohio Mar. 31, 2021) (rejecting an Equal Protection Clause challenge to an Ohio county's juror requirements that "excluded all felons from jury service," and noting that "[c]ourts have . . . uniformly rejected equal protection claims based on the exclusion of felons from jury service").

Moreover, courts have upheld jury selection frameworks that exclude individuals who have been charged with, but not yet convicted of, a felony. United States v. Barry, 71 F.3d 1269, 1273 (7th Cir. 1995) (upholding the exclusion of individuals charged with a felony against a Fifth Amendment Equal Protection challenge because "simply being charged with a crime says something about a person, something which is material to his ability to serve as a juror"); United States v. Greene, 995 F.2d 793, 795–98 (8th Cir. 1993) (agreeing that "the exclusion from juror eligibility of persons charged with a felony is rationally related to the legitimate governmental purpose[s] of guaranteeing the probity of

-22-

jurors . . . [and] of creating a pool of jurors likely to give unbiased consideration to the evidence presented").

It is unsurprising that courts have had ample opportunity to address this issue given that individuals with felony convictions have long been barred from jury service in the United States both informally and by specific statutory exclusion. See Brian C. Kalt, The Exclusion of Felons from Jury Service, 53 Am. U. L. Rev. 65, 178-79 (2003) (explaining that around the year 1800, "felon exclusion [from juries] was likely the rule, rather than the exception" in America). Indeed, as defendant points out, New York law barred individuals with convictions of felonies or misdemeanors involving "moral turpitude" from jury service prior to the enactment of Section 510(3) in 1977. N.Y. Jud. Law §§ 504(4)-(5), 596(5)-(6) (McKinney's 1975); Mot. at 2. Plaintiffs themselves acknowledge that individuals with "conviction histories" have been disqualified from jury service in New York since 1896. FAC ¶¶ 6, 21. Similarly, as noted above, federal law has, since the enactment of the Jury Selection and Service Act of 1968, prohibited individuals convicted of a felony from service on a federal jury until such time as their civil rights have been restored. 28 U.S.C. § 1865(b)(5). Section 510(3) is no different from these historical analogues and is similarly constitutional.

Plaintiffs claim that this case cannot be resolved on a motion to dismiss and attempt to distinguish cases upholding similar statutes on the ground that they "occurred where the movant was not entitled to any reasonable inferences, and none involved evidence (or even plausible allegations) demonstrating that the individuals are as capable of serving as jurors as those included in the current pool." Opp. at 23. Not so. The law is well established that jury selection criteria barring individuals with felony convictions from service on juries are constitutionally permissible. Moreover, plaintiffs' arguments do not change the fact that courts throughout the country have repeated and reaffirmed that a state's interest in juror probity is one that can serve as a legitimate justification for the exclusion of individuals with felony convictions from jury service.

Thus, even if plaintiffs had plausibly alleged a prima facie case of intentional discrimination under Castaneda and Alston, the presumption of intentional discrimination is rebutted by the legally-established justification that Section 510(3) was enacted as a measure to protect the State's legitimate interest in juror probity. Plaintiffs implicitly concede as much by failing to facially challenge the constitutionality of Section 510(3).

C. **Plaintiffs' Claims Under** _City of Oneonta_

Plaintiffs do not challenge Section 510(3) as intentional discrimination under any theory or framework other than that established in _Castaneda_. Nonetheless, as noted _supra_ n. 7, we will briefly consider whether plaintiffs have stated a claim for intentional discrimination under the framework set forth in _Brown v. City of Oneonta_ because defendant discusses it at some length in his motion. Mot. at 10-13.

Under _City of Oneonta_, a plaintiff can state a claim for intentional discrimination in three ways: (1) a "plaintiff could point to a law or policy that expressly classifies persons on the basis of race."; (2) "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner"; and (3) a "plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by a discriminatory animus." _Brown v. City of Oneonta, New York_, 221 F.3d 329, 337 (2d Cir. 2000), _overruled on other grounds by Gonzaga v. Doe_, 536 U.S. 273 (2002) (internal citations and quotation marks omitted). Here, plaintiffs do not allege, nor could they, that Section 510(3) expressly classifies individuals on the basis of race because, as plaintiffs concede, Section 510(3) is "facially race-neutral."

Opp. at 8.   Thus, plaintiffs have not stated a claim under the first approach.

The second approach offered by City of Oneonta is to "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner."  City of Oneonta, 221 F.3d at 337.   While plaintiffs argue that Section 510(3) has a disproportionate impact on Black individuals, and specifically Black men, due to deliberate discrimination in policing and prosecutorial practices, they do not contend that the statute itself is applied in an intentionally discriminatory way.  They do not, for example, allege that White individuals with felony convictions are allowed, despite the statute, to serve on New York juries, while Black individuals with felony convictions are barred from jury service under Section 510(3).

Finally, under City of Oneonta, a plaintiff can state a claim for intentional discrimination by alleging "that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."   Id. (emphasis added). Plaintiffs allege that the legislature was aware of racially discriminatory practices by the New York Police Department and New York prosecutors at the time of the enactment of Section 510(3). FAC ¶¶ 6, 23-27; Opp. at 3.   That allegation, however, is

insufficient to show a discriminatory animus in the enactment of Section 510(3).

It is well settled that in order to show discriminatory animus, it is not enough to allege that the statute's enactors were aware of a potentially disproportionate impact. Rather, the legislature must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979); see also Hayden v. Paterson, 594 F.3d 150, 162-63 (2d Cir. 2010).

Plaintiffs allege in their FAC that "the lack of legitimate justification for the Exclusion coupled with the ineluctable disparity of the Exclusion mandate the inference that the exclusion was enacted and has been maintained at least in part for the purpose of reducing the number of Black people in juror pools in the State of New York." FAC ¶ 28. This argument does not suffice to plausibly show that the New York legislature enacted Section 510(3) because of the impact that it might have on Black individuals and specifically Black men. As we have established above, Section 510(3) does not create an "ineluctable" disparity, supra pp. 13-15, and the established law, repeatedly reaffirmed by courts across the country, creates a legitimate justification for the enactment of section 510(3), supra pp. 20-24. Thus,

plaintiffs' claim under the Fourteenth Amendment fails to satisfy any of the three paths to prove intentional discrimination set forth in City of Oneonta.

### i.  Rational Basis Review

Having determined that the challenged statute, as written or as applied, does not intentionally discriminate on the basis of race, the statute is subject to rational basis scrutiny.  Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 276–77 (S.D.N.Y. 2019) (citing Feeney, 442 U.S. at 271–72).  Courts applying rational basis review must be "highly deferential" to the legislature.  Hayden v. Paterson, 594 F.3d 150, 170 (2d Cir. 2010).  When legislation is reviewed applying rational basis scrutiny, "courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws." Gregory v. Ashcroft, 501 U.S. 452, 470–71 (1991). Thus, under rational basis review, the Court will uphold a governmental classification if "the classification at issue bears some rational relationship to a legitimate state interest," Paterson, 594 F.3d at 169 (citing Plyler, 457 U.S. at 216), and a statute will not be overturned "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude

that the legislature's actions were irrational," <u>Vance v. Bradley</u>, 440 U.S. 93, 97 (1979).  No such conclusion is warranted here.

As discussed above, <u>supra</u> pp. 21-23, courts across the country have consistently held that an interest in juror probity can provide the rational basis required to survive rational basis review.  <u>Arce</u>, 997 F.2d at 1127; <u>Barry</u>, 71 F.3d at 1273; <u>Greene</u>, 995 F.2d at 795-96; <u>Shoop</u>, 2021 WL 1215793, at *19; <u>Foxworth</u>, 599 F.2d at 4.  Plaintiffs' efforts to challenge the uniform holdings that statutes like the one at issue withstand rational basis fail. New York has a legitimate interest in juror probity and is free to promote that interest by excluding individuals with felony convictions from jury service.

It is worth reiterating that plaintiffs are not arguing that Section 510(3) has been used to bar Black individuals who have not been convicted of a felony from jury service.  In other words, everyone to whom Section 510(3) applies has been shown to have disregarded the law.  Thus, the state's exclusion of individuals convicted of a felony from service on the jury "bears some rational relationship" to the "legitimate state interest" in the probity of its jurors.  <u>Paterson</u>, 594 F.3d at 169.

Plaintiffs' arguments that juror probity is not served by Section 510(3) are unavailing.  Plaintiffs contend that their allegation that "[a]s a class, people with felony convictions are

as capable of serving as jurors as any other group of citizens,"
and that "the probity concern is based on unsupported stereotypes
about the moral character and fitness of people convicted of
felonies" shows that there is no rational basis for Section 510(3).
Opp. at 22 (citing FAC ¶ 133) (internal quotation marks omitted).
Plaintiffs attempt to bolster this argument by citing to recent
statements of two New York state judges that Section 510(3)'s
exclusion of individuals with felony convictions "serves no
legitimate purpose."  Opp. at 22.  Plaintiffs contend that these
"perspectives and recent legislation passed to repeal the
Exclusion underscore the plausibility of Plaintiffs' allegations
that people with felony convictions have as much probity as the
class of citizens presumptively qualified to serve as jurors[.]"
Id.  The statements, however, reflect little more than the policy
opinions of individuals.  The legislature is certainly entitled to
consider the views of interested actors, but it is not the proper
role of this Court to weigh in on a policy debate, particularly
where, as here, there is no debate on the constitutionality of the
statute as written.  While plaintiffs and others are entitled to
their opinions, the law is clear that deference to the legislature
is required.  Heller v. Doe by Doe, 509 U.S. 312, 321 (1993)
("courts are compelled under rational-basis review to accept a

legislature's generalizations even when there is an imperfect fit between means and ends.").

Plaintiffs' next argument that voir dire "fully resolves any probity concern" is similarly unconvincing.  Opp. at 23.  Once again plaintiffs are interjecting a policy debate into the wrong forum.  That the state of New York chose Section 510(3) and the CRD and CGC procedure as its means for preserving juror probity rather than leaving the determination to litigants during voir dire is not a basis to overturn Section 510(3) under rational basis review.  Further, the practical issues with exploring the suitability of a convicted felon to serve on a jury on an individual basis during voir dire are manifest and ample to support a legislative rejection of plaintiffs' alternative.

Finally, plaintiffs cite to several cases to argue that courts applying rational basis scrutiny have struck down various lifetime bans imposed on individuals with felony convictions.  Opp. at 26–27.  These cases are inapplicable for the simple reason that they do not concern jury service, nor any state's legitimate interest in the probity of its jurors.  The cases plaintiffs cite involve policies and statutory provisions relating to the employment and licensure of individuals convicted of felony offenses.  See Chunn v. State, ex rel. Mississippi Dept. of Ins., 156 So. 3d 884, 885 (Miss. 2015) (holding that a statute that prohibited all felons

"from obtaining or renewing a bail-agent license" violated the Equal Protection Clause); <u>Furst v. New York City Transit Authority</u>, 631 F. Supp. 1331 (E.D.N.Y. 1986) (finding that a policy of dismissing all employees who are convicted of felonies violated the Equal Protection Clause as applied to an individual fired from his job as a bus dispatcher); <u>Barletta v. Rilling</u>, 973 F. Supp. 2d 132, 140 (D. Conn. 2013) (holding that Connecticut's "complete ban on felons holding precious metals licenses constitutes a violation of the Equal Protection Clause"); <u>Kindem v. City of Alameda</u>, 502 F. Supp. 1108, 1113 (N.D. Cal 1980) (finding that the firing of a janitor for a prior felony conviction "without any attempt to fit the classification to [] legitimate governmental interests . . . amount[ed] to a violation of the Equal Protection Clause."); <u>Smith v. Fussenich</u>, 440 F. Supp. 1077, 1079-81 (D. Conn. 1977) (holding that disqualification of all felons from being licensed as a private detective violated the requirements of equal protection); <u>Butts v. Nichols</u>, 381 F. Supp. 573, 581-82 (S.D. Iowa 1974) (holding that a "totally irrational and inconsistent scheme" of barring individuals with felony convictions from most civil service positions violated the Equal Protection Clause).

Further, the courts in these cases reasoned that the statutes or policies did not survive rational basis review because it was irrational to bar individuals convicted of felonies from

employment or licensure without some form of individualized assessment.  See, e.g., Furst, 631 F. Supp. at 1338 ("Before excluding ex-felons as a class from employment, a municipal employer must demonstrate some relationship between the commission of a particular felony and the inability to adequately perform a particular job."); Fussenich, 440 F. Supp. at 1080 ("The legislation fails to recognize the obvious differences in the fitness and character of those persons with felony records.").  It should be recalled that individuals with felony convictions in New York have an option to receive individualized consideration to have their qualification to serve on the jury restored by applying for a CRD or CGC, which Justin chose not to avail himself of here. FAC ¶¶ 5, 174; see also N.Y. Correction Law §§ 701(1), 703-a(1); 1991 N.Y. Op. Att'y. Gen. No. 91-F10, 1991 WL 499877 (N.Y.A.G. Dec. 31, 1991).

Only one case cited by plaintiffs in support of this argument, United States v. Uribe, 890 F.2d 554 (1st Cir. 1989), involves jury service at all.  There, defendants who had been convicted of various conspiracy and drug trafficking charges challenged their conviction on the grounds that (1) the defendants had prior interactions with one of the jurors serving on their jury that were arguably sufficient to disqualify the juror for cause; and (2) that same juror was biased because he had previously been

convicted of a felony and sentenced by the same judge presiding over their trial. Id. at 555, 559-61. The defendants thus argued that "because the juror was the beneficiary of 'lenient treatment' by the district judge, he should not have been permitted to participate in their trial," and "whether the juror was favorably or unfavorably disposed toward the court . . . he must have been biased in some indeterminable way." Id. at 561. The Uribe court found that these arguments did not suffice to justify a new trial. Uribe's fact pattern is unique, but most importantly, it is entirely irrelevant to the issues in this case.

On the pleadings before it, this Court cannot conclude that there is no rational basis for the challenged statute now and at the time of its enactment. Absent intentional discrimination or discriminatory application, as discussed above, the statute satisfies rational basis review as a matter of law.

**CONCLUSION**[9]

For the foregoing reasons, defendant's motion is granted in full, and the Court dismisses plaintiffs' claims under the Sixth and Fourteenth Amendments. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 50 and close the case.

---

[9]   The Court is aware that plaintiffs requested oral argument. See Opp. However, given that our decision is based on clear legal doctrine, the Court determined that oral argument would not be productive.

Dated:      February 13, 2026
            New York, New York

_____
        NAOMI REICE BUCHWALD
    UNITED STATES DISTRICT JUDGE